FILED

11/23/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0533

DA 19-0533

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 300

NATIONAL INDEMNITY COMPANY,

  Plaintiff, Appellant,
  and Cross-Appellee,

  v.

STATE OF MONTANA,

  Defendant, Appellee,
  and Cross-Appellant,

  and

TERRY JELLESED, RAYMOND ABRAHAMSON,
RANDALL BAETH, MARLISE BAILEY, DELMAS
BROOKS, SHIRLEY CHAPMAN, RUTH FORE,
JEFFERY GOVI, THOMAS JENKINS, JAMES
McNULTY, and PHILLIP PEREZ,

  Intervenors.

APPEAL FROM:   District Court of the First Judicial District,
               In and For the County of Lewis and Clark, Cause No. XDDV 2012-140,
               Honorable Holly Brown, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

               Mary Beth Forshaw (argued), Simpson Thacher & Bartlett LLP, New York,
               New York

               Peter F. Habein, Marcia Davenport, D. Wiley Barker, Crowley Fleck PLLP,
               Helena, Montana

               Gary M. Zadick, Ugrin, Alexander, Zadick & Higgins, PC, Great Falls,
               Montana

For Appellee:

John F. Sullivan (argued), Kate McGrath Ellis, Colin W. Phelps, Christensen & Prezeau, PLLP, Helena Montana

Calvin J. Stacey, Stacey & Funyak, Billings, Montana

For Intervenors:

Allan M. McGarvey, Roger Sullivan, Ethan Welder, Jinnifer Jeresek Mariman, McGarvey, Heberling, Sullivan & Lacey, P.C., Kalispell, Montana

J. David Slovak, Mark. M. Kovacich, Kovacich & Snipes, P.C., Great Falls, Montana

For Amicus Complex Insurance Claims Litigation Association and American Property Casualty Association:

Brian L. Taylor, Hall & Evans LLC, Billings Montana

Laura A. Foggan, Crowell & Moring LLP, Washington, District of Columbia

For Amicus United Policyholders:

Lorelie S. Master, Hunton Andrews Kurth LLP, Washington, District of Columbia

Curt Drake, Patricia Klanke, Drake Law Firm, P.C., Helena, Montana

Argued and Submitted: November 20, 2020

Decided: November 23, 2021

Filed:

_____
Clerk

2

Justice Jim Rice delivered the Opinion of the Court.

¶1 In 2012, National Indemnity Company (National, or NIC) commenced this action seeking a declaration of its rights and obligations under a general liability insurance contract (Policy) issued to the State of Montana (State) for the period between July 1, 1973 and July 1, 1975, with regard to claims of personal injury from toxic asbestos dust exposure arising from the State's failure to warn claimants of these conditions, despite conducting inspections of the source vermiculite mining and milling operations in and around Libby, Montana ("Libby Mine"), as early as the 1950s and through the 1970s. Intervenors are among hundreds of individuals who suffer from and brought claims for asbestos-related injuries as a result of exposure at or around the Libby mining operations (collectively referred to as "Libby Mine Claimants" or "Libby Mine Claims"). National alleged herein that it "had and has no obligation to defend or indemnify the State in connection with all or portions of" the asbestos injury claims asserted against the State and has "no obligation to defend or indemnify the State against Future Claims." After extensive litigation and extraordinary effort by the District Court, orders addressing numerous legal issues and a multitude of claims were entered, which ultimately concluded National had breached its duty to defend the State and was further obligated to pay claims under the terms of the Policy. Judgment in the amount of $97,883,193.39 was entered against National and in favor of the State, including prejudgment interest, attorney fees and costs, which was less than the amount sought by the State. National appeals and the State cross-appeals rulings

3

of the District Court adverse to their respective positions. We address various sub-issues, but the general issues raised by the parties are as follows:

1. *Did the District Court err in its determinations that National breached its duty to defend the State?*

2. *Did the District Court err in its determinations regarding coverage under the general liability policy issued by National to the State?*[1]

3. *Did the District Court err by awarding pre-judgment interest on the settlement amounts and defense costs?*

4. *Did the District Court's rulings violate National's due process and contract clause rights under the Montana and United States Constitutions?*

¶2 We affirm in part, reverse in part, and remand for limited further proceedings necessary to implement this Opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 This insurance-related dispute arises from underlying litigation against the State related to its regulatory role of the Libby Mine, owned and operated by W.R. Grace and Company and its predecessors, Universal Zonolite and Insulation Company and Zonolite Company. As this Court discussed in *Orr v. State*, 2004 MT 354, ¶ 37, 324 Mont. 391, 106 P.3d 100, as early as 1956, the dangers to the workers arising from asbestos and the mining conditions "were already clear and present." *See also Maryland Cas. Co. v. Asbestos Claims Court*, 2020 MT 70, ¶ 8, 399 Mont. 279, 460 P.3d 882 and *BNSF Ry. Co. v. Asbestos Claims Court*, 2020 MT 59, ¶ 4, 399 Mont. 180, 459 P.3d 857. From 1956 onward, the State relied upon a 1942 Montana Attorney General's Opinion to withhold the

---

[1] Intervenors' appellate briefing addresses coverage questions under the Policy.

results of its workplace inspections and did not advise workers of the hazardous conditions at the Libby Mine.

¶4 Ratification of Montana's 1972 Constitution brought abolishment of Montana's sovereign immunity, which the Constitutional Convention Delegates deemed "an anachronism." *Orr*, ¶ 54; *see also* Mont. Const. art. II, § 18. The State thereafter solicited bids from private insurers for provision of comprehensive general liability coverage. The State provided prospective bidders with an underwriting packet that described aspects of the State's risk, but did not mention the State's knowledge of the asbestos conditions at the Libby Mine. The State acknowledges it provided no information about the Libby Mine, or related injuries and deaths by workers, until 2002. The State also provided bidders with specifications for proposed coverage that indicated an exclusion for "[c]ontamination or pollution" was acceptable to the State. Following this bidding process, the State accepted the bid from National, which issued a comprehensive general liability policy to the State in June 1973. Therein, National agreed to pay "all sums" for bodily injury "caused by an occurrence" for which the State "shall become legally obligated to pay as damages," with National having the "right and duty to defend any suit against the insured seeking damages on account of such bodily injury." The initial term of the policy was for a three-year period between July 1, 1973, and July 1, 1976, but National unilaterally cancelled coverage as of July 1, 1975. Glacier General Assurance Company, now defunct, provided coverage for the State in the interim, and, commencing in 1976, the State has since maintained a

comprehensive self-insurance program, as authorized under §§ 2-9-101 through 305, MCA.

¶5 Beginning in 2000, Libby Mine Claimants began filing tort claims against the State for injuries resulting from asbestos exposure during times prior to, during, and after the term of the National policy. *See Orr*, ¶ 3. *Orr* involved nine claimants and was an early proceeding, which asserted negligence based upon the theory the State had failed to warn claimants of the dangers of asbestos exposure, resulting in bodily injuries. In response to the lawsuits, the Risk Management and Tort Defense Division of the State Department of Administration hired outside counsel to defend the State pursuant to its self-insurance program and did not notify National of the claims. Between September 2000 and June 2002, 18 lawsuits were filed against the State. State-retained counsel served responsive pleadings, filed dispositive motions and briefing, and argued for dismissal, still without notifying National.

¶6 In January 2002, the State began searching its storage records for an insurance policy, and in June 2002 located the Declarations Page of the National Policy indicating comprehensive general liability coverage. On June 27, 2002, Dale Cockrell, counsel for the State, made the first contact with National regarding the claims then filed, writing that:

> [W]e are tendering these claims to National Indemnity . . . it appears that National Indemnity provided comprehensive general liability insurance to the State from on or about 1973 through 1975 or 1976.

The State listed the first 18 Libby Claim lawsuits, provided copies of 12 of those complaints, advised that the State had "filed Motions to Dismiss each of the complaints

6

that have been served upon the State," and requested a copy of the insurance policy. Shortly thereafter, Cockrell sent National a follow-up letter, providing five of the remaining six complaints, and advising the State had argued the dismissal motions. Both letters were received by National in July 2002. Despite the "tendering" language within the June 27, 2002 letter, neither letter referenced or requested that National pay the State's counsel, assume defense responsibilities, reimburse the State's incurred defense costs, or provide any other assistance on the claims. In response to the letters, National Claims Administrator Reed Grandgenett called Cockrell, who advised Grandgenett that, the State's motions having been argued, "there was nothing further to be done."

¶7 In August 2002, the District Court granted the State's motion to dismiss the *Orr* proceeding, and the *Orr* Claimants appealed to the Montana Supreme Court. In November 2002, National opened a claim file for the Libby Claims and internally set aside $25,000 for "various asbestos claims" at the "Toxic Site: W.R. Grace Mine in Libby, Montana," listing a date of loss as July 1, 1973, and noting potential coverage issues. On December 12, 2002, National learned about the District Court's *Orr* ruling from online sources and immediately contacted the State, requesting the State keep it informed regarding the *Orr* proceeding. Cockrell followed up with a letter to Grandgenett summarizing the status of the *Orr* Claimants' appeal and promising to send copies of the State's briefing. The letter did not submit invoices for defense costs, request funding or assumption of the Libby Claim lawsuits, or request other assistance from National. On

December 20, 2002, eight days after learning of the *Orr* appeal, National internally increased its claim defense reserve to $200,000.

¶8 Over the next seven months, the State continued to manage the Libby Claims and did not further contact National regarding the *Orr* appeal. On August 7, 2003, Grandgenett telephoned Cockrell, who confirmed the *Orr* appeal had been argued in June 2003, the case would likely be decided in the next six months, and that all Libby Mine Claims had been stayed pending the decision. Grandgenett wrote in his notes that Cockrell "will call me to let me know Supreme Court decision. We can decide what needs to be done to further evaluate based on Supreme Court outcome."

¶9 In December 2004, this Court reversed the District Court's dismissal of the *Orr* claims. *Orr*, ¶¶ 1, 82. The State did not then advise National of the decision but petitioned for rehearing. Rehearing was denied on February 2, 2005, about which time Grandgenett learned about this Court's *Orr* ruling from other sources. This began a period of a marked increase in communications between the State and National regarding litigation status and coverage under the Policy.

¶10 On March 17, 2005, the State, as explained by the District Court, "contacted National for the first time in 17 months" via a letter from Cockrell to Grandgenett. Cockrell explained the Montana Supreme Court had ruled in favor of the Libby Claimants, denied rehearing in February 2005, and remanded the proceeding. Cockrell provided an updated list of all pending Libby Claims, reporting on the status of the original 18 claims and notifying National of an additional 72 Libby Claims. Cockrell would thereafter forward

8

Libby Claimant complaints and notices of claims to National as they were received. Cockrell concluded by referencing his letter of June 27, 2002, and inquired for the first time "whether National Indemnity is accepting this tender and will be providing a defense to the State and providing coverage for these claims." In response, on April 7, 2005, Grandgenett wrote that "the information received thus far is insufficient for us to determine the respective obligations of our Company and the State under the Policy with respect to the pending claims," and requested the State's "cooperation and assistance in gathering information necessary for National Indemnity to promptly and accurately determine and perform all of our duties under the contract of insurance and applicable law." The letter itemized numerous information and documentation requests, and concluded by stating, "[u]nder the present circumstances, National Indemnity is reserving all of its rights with respect to the Policy and the claims asserted against the State."

¶11 On July 18, 2005, Grandgenett wrote to William Gianoulias, Chief Counsel of the State's Tort Claims Division, for the purpose of directly responding to Cockrell's inquiry regarding the State's request to defend, stating that National "agrees to defend the State of Montana against claims asserted against the State of Montana in the Libby Mine Claims subject to a complete reservation of rights under the Policy and applicable state law." The letter then discussed the coverage issues National would be reserving, including that claims may be excluded under the definition of "occurrence," the pollution exclusion, any loss known by the State, or claims that exceeded the Policy limit of $3 million "for all bodily injuries and property damage resulting from an occurrence." In addition, National took the

9

position that "all defense costs, as well as any losses to which the Policy applies, must be allocated pro rata based on time on the risk," explaining that "an equitable allocation of time on the risk would include self-insurance in the same manner as periods of commercial insurance was in force." National reserved the right to seek reimbursement if National was determined not to owe Montana a defense or if liability limits had been exhausted.

¶12 In November 2005, in a letter to Grandgenett and J. Michael Gottschalk, National's Vice President, Claims, Gianoulias conveyed the State's rejection of National's defense offer, stating:

> Your [July 18, 2005] letter provides that with respect to the Libby Asbestos claims, National Indemnity will defend the State of Montana against those claims subject to a complete reservation of rights under the policy of insurance issued to the State of Montana by National Indemnity and applicable state law. Your letter further provides that National Indemnity believes all defense costs must be allocated pro-rata based on time on the risk. Your letter also provides that no defense is owed after National Indemnity pays what it asserts are the liability limits, and reserves the right to seek reimbursement of defense costs and payments made after exhaustion of liability limits. The State of Montana respectfully disagrees with National Indemnity's positions. The State of Montana further believes a reservation of rights is not appropriate.

Gianoulias also advised National that the Libby Claims had been temporarily stayed by the Delaware bankruptcy court handling W.R. Grace's bankruptcy proceeding, which would forestall resolution of the claims.

¶13 In meetings and communications in early 2006, Gottschalk conveyed National's position that it did not have "any obligation to indemnify the State against the Libby Mine Claims," but notwithstanding it was defending the State and therefore needed to be able to participate in any settlement discussions between Montana and the Libby Mine Claimants.

10

Gottschalk expressed "surprise" in an April 6, 2006 letter to Gianoulias to Gianoulias' claim that National was not defending the State. Gianoulias replied on April 10, 2006, reaffirming the State's position it had tendered defense of the Libby Claims in 2002, and explained:

> Your letter indicates that National Indemnity . . . is surprised by the State's position that National Indemnity is not defending the State. That statement is puzzling. *As your letter indicates, while National Indemnity has made a proposal to provide a limited, apportioned defense, at no time has it proposed to provide a complete defense to the State.*
>
> .   .   .
>
> In the July 20, 2005 meeting, in support of your proposal to contribute to the defense of the costs of these claims you discussed three fractions as examples of the portion National Indemnity might contribute . . . .
>
> The State's position has been clear and consistent . . . that the State requests National Indemnity to provide a complete defense and to indemnify it completely for the Libby claims. *Given the positions and proposals National Indemnity has taken and presented with regard to the State's clear and unequivocal tender request, National Indemnity can claim no surprise about the fact that it is not defending the State of Montana.*

(Emphasis added.)

¶14 The parties met on April 18, 2006, to discuss their positions on respective rights and obligations under the Policy and held a conference call the next day. Gottschalk followed up these sessions with a letter to Gianoulias on May 10, 2006, addressing key aspects of the meetings. Related to National's position on defense of the claims, Gottschalk stated that National "was willing to pay 100% of the cost of defending the State" against the Libby Claims, subject to the reservation of rights previously stated, adding that he wanted "to leave no doubt whatsoever regarding the commitment of National Indemnity Company

11

to defend the State." Gottschalk requested copies of the engagement agreements for the State's counsel, as well as "invoices, summaries or other information concerning the State's defense costs to date," which the State had refused to provide, so that National could begin its analysis of those costs. Gottschalk nonetheless insisted the State's "reference to having tendered these claims to us in 2002 is disingenuous at best." Gottschalk also offered an alternative option whereby National would pay a portion of defense costs while waiving any right to be reimbursed by the State for such costs, but stated National was unable to agree to the State's request to indemnify the State against the Libby Claims with no reservation of rights. On May 19, 2006, Gianoulias rejected all of Gottschalk's May 10 proposals, reiterating its positions on tender and full indemnity as the only option the State would accept.

¶15     Beginning in June 2008, certain Libby Mine Claimants from the *Orr* consolidated cases began discussions with the State and National regarding a settlement. The State expressed an interest in a global resolution, and thereafter the Libby Claimants made a global settlement demand. In June 2009, National offered to contribute the Policy's $3 million occurrence limit to a settlement in exchange for a complete release of the State, while continuing to contest the validity of the claims and assert its coverage defenses to the State. When this offer was declined, National made a series of offers in increasing amounts leading up to a 3-day mediation session involving the State, National, and the Libby Mine Claimants on November 16-18, 2009.[2] On the final day of mediation, the State

_____

[2] The mediation addressed the "Libby Mine Claims," defined as all claims made prior to November 18, 2009, which was then approximately 1,000 in number.

and the Libby Mine Claimants entered a "comprehensive global settlement" for payment in the amount of $43 million. Over a reservation of rights, including recoupment, National contributed or "advanced" $16.1 million toward the settlement, based upon National's valuation of the claims at $13.1 million and the State's representation it had expended $3 million in defense costs. On September 8, 2011, the district court approved the $43 million settlement, and National paid the agreed upon $16.1 million contribution.[3]

¶16 Paralleling the claim settlement negotiations were continuing discussions between the State and National regarding Policy obligations. About the time of National's $3 million settlement offer in June 2009, the State suggested "seeking a judicial determination of the mutual rights and obligations of National and the State under the insurance Policy." On July 24, 2009, National replied in general agreement, but also suggested "it is sensible, and would be fruitful at this time, to first discuss exactly those issues with the assistance of a neutral mediator." On October 7, 2009, the State and National met to attempt to negotiate a "global resolution" of coverage disputes regarding the Libby Mine Claims, at which National conveyed several offers that were rejected by the State, but which led to National's payment of $16.1 million toward the November 2009 Global Settlement. In June of 2010, Montana and National entered a "Tolling Agreement" to toll the statutes of limitations on the parties' claims against the other. The agreement recognized that the

---

[3] Payment of the $43 million was allocated as follows: 1) the State: $26.8 million; 2) National: $16.1 million with reservation of rights; and 3) Montana Insurance Guaranty Association (MIGA): $100,000. MIGA's payment was made on behalf of the insolvent Glacier General Assurance Company.

State "has tendered to National the defense and indemnity of . . . the Libby Mine Claims," and that "National disputes that it has any obligations under the Policy or otherwise with respect to the Libby Mine Claims." In October 2010, pending judicial approval of the $43 million Global Settlement, the parties entered an "Amended Memorandum of Understanding," agreeing that "any portion of the $16.1 million initially advanced by National . . . shall not constitute an acceptance by the State of any defense offered by National."[4] Both the State and National reserved the right for "reimbursement from the other" for all advanced funds, and reserved "all rights, claims and defenses either of them have or may have or assert against the other." National agreed to respond upon tender for defense of all future Libby Mine Claims.

### *Case Procedural Background*

¶17    Following a failed mediation between National and the State, National filed this action in District Court on February 23, 2012, seeking a declaratory judgment over its rights and obligations under the Policy regarding the Libby Mine Claims, requesting a ruling that it "had and has no obligation to defend or indemnify" the State for any past or future Libby Mine Claims, and asking for reimbursement of "all money National paid in connection with the defense or settlement of any Underlying Actions which are outside the Policy." The State counterclaimed for breach of contract, alleging National breached its duty to defend for failing to "provide a prompt and proper response" to the State's tender

---

[4] The original Memorandum of Understanding had been entered by the parties upon the conclusion of the Global Settlement negotiations on November 18, 2009.

of defense of the Libby Mine Claims, and breached the duty to indemnify under the Policy. The District Court granted certain Libby Mine Claimants leave to intervene to address application and interpretation of the Policy, including whether coverage is available, and, if so, the amount of coverage and number of "occurrences" under the Policy. The parties engaged in discovery and motion practice. By September of 2015, the State had notified National of 860 additional Libby Mine Claims not included in the Global Settlement reached in November 2009. Both parties moved for summary judgment.[5]

¶18 Beginning March 1, 2018, and culminating in entry of the August 6, 2019 Judgment, the District Court entered a series of substantive orders deciding the parties' claims and positions, which, as related to the issues raised herein, we summarize as follows: 1) National did not breach its duty to defend in 2002, as claimed by the State, because the State did not then clearly tender defense of the Libby Mine Claims to National. 2) After a proper tender by the State, National breached its duty to defend in 2005 by conditioning its defense upon a pro rata allocation of defense costs, estopping National from denying

---

[5] Consistent with their view of the factual record for purposes of their respective motions for summary judgment in the District Court, neither party has offered a primary argument on appeal that summary judgment was precluded by a genuine issue of material fact. National's briefing argues a secondary position that, if the Court did not order judgment in its favor, then issues of fact precluded judgment and the case should be "remand[ed] for additional fact-finding." *Appellant/Cross-Appellee National Indemnity Company's Opening Brief*, p. 57, n.14; *see also* p. 30 ("At a minimum, this action should be remanded for further proceedings."). At oral argument, National argued it was entitled to judgment as a matter of law on the record. When asked about its position on any remaining conflicts of material fact, National's counsel mentioned only a concern about the District Court's interpretation of National's July 18, 2005 letter to the State for purposes of the duty to defend. In that regard, even with conflicting interpretational arguments, the letter speaks for itself and did not constitute a genuine conflict of material fact precluding summary judgment.

coverage and or asserting other coverage defenses; and, therefore, obligating National to pay defense costs and completed settlements on Libby Claims for which National had not provided a full defense as of the date each settlement had been approved by the presiding District Court. 3) Beginning in May 2006, National offered a full defense properly subject to a reservation of rights, rejecting the State's reservation argument, and did not breach the duty to defend for claims tendered thereafter on account of a failure to defend. 4) However, National again breached the duty to defend when failing to seek resolution of coverage issues by expeditiously filing a declaratory action after the State rejected National's offer to defend, instead waiting to file until February 23, 2012, after the 2009 Global Settlement; and thus National was estopped from raising Policy defenses and was obligated to pay all post-May 2006 claims tendered to it and settled by the State prior to February 23, 2012. 5) National was not estopped from raising coverage defenses for post-May 2006 tendered claims that were not settled as of February 23, 2012, and which were tendered after that date, essentially including all future claims; for these claims, National's declaratory action was timely. 6) National's coverage defenses were generally rejected, but the Policy was applied "to the extent the claimant was 'exposed to asbestos during the Policy period.'" Each individual claimant's exposure during the policy period, as well as the additional exposure over time, constituted a separate occurrence for purposes of Policy limits. The District Court declined to address National's objections to the reasonableness of any settlements, fees, or costs associated with the settlements, as National did not raise reasonableness at the time the settlements were approved by the district courts. The District

16

Court ordered National to pay all defense costs incurred by the State, including attorney fees, and pre- and post-judgment interest, on all properly tendered claims, as well as costs and attorney fees incurred for defense of this declaratory action.

¶19 Reduced to dollars and cents, the judgment entered by the District Court in August 2019 totaled $97,833,193.39, consisting of $26,800,000 for the remainder of the November 2009 Global Settlement, giving credit to National for the $16.1 million it had contributed, and $21,285,900 in accompanying prejudgment interest; $29,589,933.86 to indemnify the State for settlements paid to claimants exposed during the policy period, and $4,861,904.98 in accompanying prejudgment interest; $6,872,918.69 for the State's attorney fees and costs paid for defending the Libby Mine Claims from July 18, 2005, up to June 5, 2019; $4,902,120.42 for prejudgment interest on the State's claim defense costs; and $3,570,410.44 for State's attorneys' fees and costs incurred in defending this action through March 29, 2019.

¶20 National appeals, challenging all rulings of the District Court that resulted in a financial award for the State and against National in the Judgment. The State cross-appeals, challenging the District Court's rulings on issues on which it did not prevail. The practical "big picture" of this case is that, with the exception of National's $16.1 million conditional contribution to the first global settlement, the State has resolved all Libby Claims made against it, as well as those "Future Claims" made against it after judgment in this matter was entered, and this litigation will determine the amount, if any, National is required to compensate the State toward the cost of those claims. National

17

argues it owes nothing and requests that summary judgment be entered in its favor, while the State argues the amount owed is more than awarded in the Judgment.

## STANDARD OF REVIEW

¶21 This Court reviews a district court's entry of summary judgment and the interpretation of an insurance contract *de novo*. *Kilby Butte Colony, Inc. v. State Farm Mut. Auto. Ins.*, 2017 MT 246, ¶¶ 7-8, 389 Mont. 48, 403 P.3d 664 (citations omitted). Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," M. R. Civ. P. 56(c)(3), and "[w]hen the material facts are undisputed, the question of whether an insurer breached its duty to defend is a question of law." *State Farm Fire & Cas. Co. v. Schwan*, 2013 MT 216, ¶ 12, 371 Mont. 192, 308 P.3d 48 (citing *Travelers Cas. & Sur. Co. v. Ribi Immunochem Research*, 2005 MT 50, ¶ 14, 326 Mont. 174, 108 P.3d 469). "If no material facts are in dispute, the question of whether or not an insurer breached its duty to defend is a question of law." *J & C Moodie Props., LLC v. Deck*, 2016 MT 301, ¶ 17, 385 Mont. 382, 384 P.3d 466 (citing *Schwan*, ¶ 12).

## DISCUSSION

¶22 *1. Did the District Court err in its determinations that National breached its duty to defend the State?*

¶23 This issue encompasses the State's cross appeal of the District Court's rulings that National did not breach its duty to defend between 2002 and 2005, or breach the duty in 2006, and National's appeal of the District Court's rulings that it breached the duty to defend in 2005 and breached again in the time period leading to the filing of this action in

18

2012. We hold the District Court correctly determined National's breaches of the duty to defend, although under partially different rationales.

*a. Duty to Defend: 2002-2005*

¶24 The State argues National's duty to defend was triggered in July 2002, when the State notified National of the first claims by letter, stating, "we are tendering these claims to National Indemnity," and that the duty was likewise breached at that point by National's failure to defend the State. The State argues National "made no offer to defend until July 2005," and that, "[d]uring this interval, the State lost the *Orr* appeal." Thus, the State reasons that because this breach "includes NIC's failure to defend the *Orr* appeal," and because the *Orr* decision authorized all subsequent Libby Claims against the State, National "is responsible for all settlements, defense costs and prejudgment interest," essentially, the entirety of all costs associated with all Libby Claims. During oral argument, National described the State's position as "'estoppel for all time' . . . an extraordinary, unprecedented ask."

¶25 The District Court summarized the 2002-2005 timeline as follows:

> [N]either of the [June-July 2002] Cockrell Letters requested that National assume the defense of the Original Libby Lawsuits, pay the State's retained defense counsel, or reimburse the State's defense costs. Likewise, the State itself, as a knowledgeable and sophisticated customer, did not make any specific request that National take over the defense of the Libby Lawsuits, and Cockrell continued to defend the State in the Libby Lawsuits until the December 2004 Montana Supreme Court ruling in *Orr*. It was not until February 2005 that Grandgenett learned of the Court's ruling when he read it in the media, and neither Cockrell nor the State had had any contact with National for over 17 months.

The District Court thereafter concluded, "[u]nder these circumstances, the Court cannot say that the State clearly tendered defense of the Libby Lawsuits to National in 2002," citing *Hartford Accident & Indem. Co. v. Gulf Ins. Co.*, 776 F.2d 1380, 1383 (7th Cir. 1985) ("Mere knowledge that an insured is sued does not constitute tender of a claim . . . . An insurance company is not required to intermeddle officiously where its services have not been requested.").

¶26　Our jurisprudence has not required a formal tender of a claim by the insured in order to trigger the insurer's duty to defend, or employed such terminology generally. "Montana law is well-settled that an insurer's *duty to defend its insured arises* when an insured *sets forth facts* which represent a risk covered by the terms of an insurance policy." *Farmers Union Mut. Ins. Co. v. Staples*, 2004 MT 108, ¶ 20, 321 Mont. 99, 90 P.3d 381 (citing *Lindsay Drill. & Cont. v. U.S. Fid. & Guar. Co.*, 208 Mont. 91, 94, 676 P.2d 203, 205 (1984); *Graber v. State Farm Fire & Cas. Co.*, 244 Mont. 265, 270, 797 P.2d 214, 217 (1990); and *Grindheim v. Safeco Ins. Co.*, 908 F. Supp. 794, 798 (D. Mont. 1995)) (emphasis added). "The general rule is that the insurer has a duty to defend *when a complaint filed against its insured sets forth facts* which bring the event within the policy provisions." *Graber*, 244 Mont. at 270, 797 P.2d at 217 (citing *Atcheson v. Safeco*, 165 Mont. 239, 245, 527 P.2d 549, 552 (1974)) (emphasis added). "An insurer's duty to defend its insured arises when an insured sets forth facts that present a risk that possibly would be covered by the terms of an insurance policy." *Horace Mann Ins. Co. v. Hanke*, 2013 MT 320, ¶ 24, 372 Mont. 350, 312 P.3d 429 (citing *Staples*, ¶ 20). Indeed, we further held that

"an insurer's duty to defend may arise from an insurer's knowledge of '*facts obtained from outside the complaint*,'" and thus, the duty is not exclusively dependent upon notice of facts from the insured. *Huckins v. United Servs. Auto. Ass'n*, 2017 MT 143, ¶ 15, 387 Mont. 514, 396 P.3d 121 (citing *Revelation Indus. v. St. Paul Fire & Marine Ins. Co.*, 2009 MT 123, ¶ 39, 350 Mont. 184, 206 P.3d 919) (emphasis added).

¶27 While the District Court concluded that the State did not "clearly tender" the Libby Claims until 2005, we agree with the State that such a particular event was not necessary to trigger National's duty to defend. With Cockrell's June 27, 2002 letter to National, the State provided twelve "self-explanatory" complaints filed by Libby Claimants. One complaint, *Flesher, et al. v. State of Montana*, pled facts for multiple plaintiffs who worked at the Libby Mine or were exposed to asbestos between 1973-1975, the applicable policy period. The complaint alleged the State failed to warn mine workers and the public regarding asbestos toxicity, directly causing the plaintiff's asbestos related lung disease. The complaints set forth facts, which, if proven, would render the State legally obligated for bodily injury damages. Further, National was aware of extrinsic facts that the State faced the potential of increased liability following the *Orr* dismissal, subsequent appeal, and this Court's *Orr* decision. National was obligated to construe these facts from the perspective of the State and not its own. *Staples*, ¶ 22 (the insurer "is under a duty to construe the factual assertions from the perspective of the insured rather than solely from the insurer's own perspective").

> When a court compares allegations of liability advanced in a complaint with policy language to determine whether the insurer's obligation to defend was

> "triggered," a court must liberally construe allegations in a complaint so that all doubts about the meaning of the allegations are resolved in favor of finding that the obligation to defend was activated.

*Staples*, ¶ 22. Unless there exists an "unequivocal demonstration" that a claim against the insured falls outside policy coverage, the insurer's duty is to defend. *Staples*, ¶ 22. We conclude that National's duty to defend arose in 2002 when the State contacted National and provided the initial complaints alleging the State's negligence caused bodily injury during the policy period.

¶28 The determinative question becomes whether, following the State's notice to National of the Claims in 2002, National then *breached* its duty to defend under Montana law. We have not imposed rigid requirements for satisfaction of an insurer's duty to defend, but have assessed the circumstances of each case. We "review[] all of the facts in the matter to determine" whether the duty to defend has been satisfied. *J & C Moodie*, ¶ 25. "The duty to defend commonly requires the hiring of legal counsel, but may not in every case." *Schwan*, ¶¶ 18-20 (holding insurer did not breach the duty by failing to hire additional counsel for insured who was defended on all claims by another insurer, reasoning "[i]t would make little sense for State Farm Fire to provide other legal counsel when such a need was not demonstrated."); *see also Farmers Ins. Exch. v. Johnson*, 2009 MT 442, ¶ 12, 354 Mont. 192, 224 P.3d 613 (under the circumstances of "an informal, voluntary" pre-litigation meeting, insurer did not breach duty to defend by adjuster's attendance instead of legal counsel). We reasoned in *Schwan* that the duty was fulfilled when the insurer "ensure[d] a full defense was provided" to the insureds, even though the

insurer there determined not to hire additional counsel, and thus the insureds were not "left unprotected or . . . prejudiced" by the insurer. *Schwan*, ¶¶ 20, 24. In *Westchester Surplus Lines Ins. Co. v. Keller Transp., Inc.*, 2016 MT 6, 382 Mont. 72, 365 P.3d 465, we held the insurer, an excess carrier, did not breach the duty after temporarily withdrawing from the insureds' defense during a period when the defense was tendered to the primary insurer, because the insureds "were not declined a defense" and were "continually represented by counsel," despite a "short delay" in defense payments after the insurer later re-initiated defense of the insureds. *Westchester*, ¶ 31. In contrast, we concluded the insurer breached the duty in *J & C Moodie*, despite the insureds having other counsel, because the insurer "made no effort to contact the co-insurer to further understand the claims, offered no coordination, and provided no other defense support," even failing to "seek a declaratory ruling to confirm its internal coverage determination." *J & C Moodie*, ¶ 27. We concluded the insurer "did nothing to honor the contractual benefit that [the insured] had secured under the policy." *J & C Moodie*, ¶ 28. In sum, the insurer must give "the necessary substance to the duty to defend and fulfil[] its contractual duty to the [insureds] under the policy." *J & C Moodie*, ¶ 23 (quoting *Schwan*, ¶ 20).

¶29    In response to Cockrell's initial two letters in July 2002, National's Grandgenett contacted Cockrell, who advised Grandgenett that the State had filed and argued motions to dismiss the actions, and "there was nothing more to be done." Despite the tendering language in Cockrell's first letter, neither letter referenced or requested that National pay the State's counsel, assume defense responsibilities, reimburse the State's incurred defense

23

costs, or provide any other assistance on the claims. In the time thereafter, the State submitted no bills for legal services to National or made any other request for defense support. National was slow to forward a copy of the Policy it had located in its archives, but maintained contacted with the State, while the State was slow in its communications with National. In December 2002, National independently learned of the District Court's dismissal of the *Orr* claims, and initiated contact with the State, asking to be kept informed of the *Orr* proceeding. Cockrell followed with a letter to Grandgenett about the *Orr* appeal, again with no request for support. In response, Grandgenett increased National's defense reserve. However, for the next seven months, until Grandgenett again initiated contact in August 2003, the State managed the Libby Claims without further contact with National. Grandgenett then wrote in his notes that Cockrell "will call me to let me know [sic] Supreme Court decision. We can decide what needs to be done to further evaluate based on Supreme Court outcome." However, the State did not advise National of this Court's *Orr* decision, and National learned about it from other sources. It was not until March 2005 that the State recontacted National and the parties began to have consistent communication. In his March 2005 letter, Cockrell referred to his June 2002 letter and asked for the first time "whether National Indemnity is accepting this tender and will be providing a defense to the State." Referencing the period from 2002 to 2005, Cockrell, as the State's 30(b)(6) witness, testified in deposition that the State did not want National to hire additional counsel and there was no reason to do so.

¶30 The record is clear that the State initially defended the Libby Claims through its own self-insurance operation, hired its own counsel, managed the litigation, and made its own defense decisions. It gave notice to National in 2002, but from 2002 to 2005, the State took the position with National that it had the matter under control, and nothing was left to be done, and, indeed, it appears from the record National would have had to knock the State out of the saddle and wrest control of the litigation to participate in the defense, as the State relinquished nothing. *See* § 28-11-316, MCA ("the person indemnified has the right to conduct defenses if the person indemnified chooses to do so."). The State's interests were adequately protected by its own counsel, afforded through its self-insurance. *Schwan*, ¶ 20. It was not until March 2005 that the State requested any action by National. It thus comes as no surprise that National acted minimally. Under these circumstances, we conclude National satisfied the "necessary substance" of the duty to defend between 2002 and 2005. *Schwan*, ¶ 20. Consequently, we affirm the District Court's determination that National did not breach its duty to defend during this period.

*b. Duty to Defend: 2005*

¶31 Things changed dramatically for the State with this Court's December 2004 decision in *Orr*, which reversed the District Court's dismissal and allowed the *Orr* claims, and by extension, all such Libby Claims, to proceed. The State re-initiated contact with National in March 2005, and National admits the State requested that National assume defense of the Libby Claims in mid-March 2005. The District Court determined that, in response to the State's request, National breached its duty to defend in July 2005, and did not cure the

breach, or again properly fulfil the duty to defend, until May 2006. Thus, on appeal, National argues the District Court erred by determining it breached the duty in July 2005, but agrees with the determination it was properly defending the State by May 2006. The State's position is the opposite, agreeing with the District Court's determination that National was in breach from July 2005 to May 2006, but cross-appealing the District Court's determination that National cured the breach or properly began defending the State in May 2006. We first take up National's actions in 2005.

¶32    On July 18, 2005, Grandgenett wrote to Gianoulias to respond to Cockrell's request that National defend the State. National expressed agreement with defending the State, subject to a reservation of rights on certain issues, which Grandgenett outlined in the letter, including that "[u]nder the Policy and applicable law we believe all defense costs, as well as any losses to which the Policy applies, must be allocated pro-rata based on time on the risk." National explained that its pro rata position included periods of self-insurance by the State in the same manner as it would commercial insurance.[6] The State broadly rejected National's terms, stating it believed "a reservation of rights is not appropriate," and specifically rejected National's position requiring a pro rata allocation of defense costs "based on time on the risk." The District Court determined that "National breached its duty to defend the State by indicating in its July 18, 2005 Letter that it only would pay defense costs, and any losses to which the Policy applied, on a pro-rata basis."

---

[6] The only other commercial insurance carried by the State was with the now-insolvent Glacier General Assurance Company.

26

¶33    National argues its July 18, 2005 letter satisfied the duty to defend by its statement that "National Indemnity agrees to defend the State of Montana against claims asserted against the State of Montana in the Libby Mine Claims," and that the District Court erred by concluding that National "offered a pro-rata defense," because its pro rata statements were merely one of several rights it was reserving for later resolution, stating in its briefing:

> Explaining one of its reservations (as an insurer is required to do by law), the letter went on to note that National "believe[d] all defense costs, as well as any losses to which the Policy applies, must be allocated pro-rata based on time on the risk." [citing Appendix].  Accordingly, *National only reserved its right to seek pro-rata allocation.  Nowhere does the July 18, 2005 letter state that National would not front all defense costs in the first instance*.

(Emphasis added.)

¶34    However, we disagree.  After the portion quoted by National's briefing, the Letter continues by stating:

> *National Indemnity will pay its share of an equitable allocation* among all insurers and the State of Montana of the cost of defending the State of Montana against the Libby Mine Claims . . . .  We look forward to promptly developing and implementing with the State *a suitable means for National Indemnity to pay its share of those defense costs* . . . .

> .   .   .

> The expense of defending the State of Montana against the Libby Mine Claims *which National Indemnity will share* includes all reasonable and necessary costs and fees relating to the State of Montana's defense.

(Emphasis added.)

¶35    Clearly, the Letter was not merely reserving the issue of pro rata allocation of defense costs, but was conveying, contrary to National's argument, that National would indeed "not front all defense costs in the first instance," requiring that National's

27

participation in the State's defense be limited to a pro rata allocation of time on the risk, which National defined as "the two-year Policy period," and urging a system be "promptly" implemented to determine this limited contribution by National. The April 10, 2006 letter from Gianoulias to Grandgenett correctly stated that "while National Indemnity has made a proposal to provide a limited, apportioned defense, at no time has it proposed to provide a complete defense to the State . . . ." The letter makes clear that National contemplated only a pro rata defense: "In the July 20, 2005 meeting, in support of your proposal to contribute to the defense costs of these claims you discussed three fractions as examples of the portion [National] might contribute. Your proposals were: Jacobson – 1/50th, Smith – 2/47ths and Graham – 2/35ths." In light of these representations and offers, we agree with the April 10, 2006 letter's statement that: "National Indemnity can claim no surprise about the fact that it is not defending the State." The District Court's application of the plain language of National's Letter was correct.

¶36 There is no dispute the Libby Claims, premised upon the State's asserted negligence, implicated potential coverage under the Policy. *See Huckins*, ¶ 15 (to determine whether an insurer had a duty to defend the insured, we "look first to the terms of the policy, and next to the facts alleged [in the] complaint."). There was no "unequivocal demonstration" otherwise. *Staples*, ¶ 22. Further, regarding National's defense responsibilities, the Policy provided that National had "the duty to defend any suit against the insured seeking damages on account" of bodily injury to which the insurance applied. The "duty to defend requires an insurer to act immediately to defend the insured from a

28

claim," and "must do so on the basis of mere allegations that could implicate coverage, if proven." *State Farm Mut. Auto. Ins. Co. v. Freyer*, 2013 MT 301, ¶ 37, 372 Mont. 191, 312 P.3d 403. Montana is a "mixed-action rule" jurisdiction, a rule requiring "an insurer to defend all counts in a complaint so long as one count potentially triggers coverage, even if the remaining counts [of the complaint] would not be covered." *Schwan*, ¶ 16 (citing *Newman v. Scottsdale Ins. Co.*, 2013 MT 125, ¶ 40, 370 Mont. 133, 301 P.3d 348). The Libby Mine litigation, initially focused on the *Orr* cases but including and widely expanding to others, bombarded the State with claims allegedly arising from the State's negligence over decades of time. For purposes of the duty to defend, all of these claims fell within National's initial responsibility to defend the State. The District Court correctly determined that National's clear attempt to limit its defense responsibility to a pro rata portion of these claims violated the Policy and the duty to defend.

*c. Duty to Defend: 2006*

¶37    Following further discussions regarding the State's objections to National's defense offer in 2005, which we just concluded breached National's duty to defend, Gottschalk wrote to Gianoulias on May 10, 2006, stating his intent was "to leave no doubt whatsoever regarding the commitment of [National] to defend the State," and that National "is willing to pay 100% of the cost of defending the State." Even though offering optional defense alternatives involving pro rata cost sharing and making the 100% offer upon a reservation of rights "under the Policy and applicable law," National nonetheless removed the prior condition that the State participate in a pro rata sharing of defense costs. The District Court

29

distinguished between National's conditioned pro rata defense offer in July 2005, which it held was a breach, and National's reservation of the right to seek pro rata recoupment of defense costs in May 2006, which it held was proper, and concluded that National's May 2006 actions were a lawful "tender of a full defense."

¶38 The State cross-appeals this ruling, contending National's reservation of rights triggered, similar to its argument that National breached the duty in 2002, a case-wide breach of the duty to defend resulting in a perpetual estoppel of National's coverage defenses on all Libby Claims forever, because National made this same reservation with all of its defense offers. Specifically, the State first argues the May 2006 "offer to defend with *a condition* of recoupment for defense costs of potentially-covered claims" was another breach of the duty to defend. (Emphasis added.) However, unlike the pro rata condition required in its July 2005 defense offer, National did not make its full defense offer in May 2006 upon a *condition* that the State pay a pro rata share of defense costs. Rather, it notified the State it was *reserving* its right to "*seek* reimbursement . . . for defense costs paid with respect to claims to which the Policy *ultimately is determined not to apply*." (Emphasis added.) National thus eliminated the conditioned defense that violated the duty to defend in July 2005. As the District Court determined, "National was not only entitled, but was required, to preserve its right to recoup its defense costs and clearly notify the State that National would seek reimbursement of defense costs paid *if it was later determined that the State's claims were not covered* under the Insurance Policy." (Emphasis added.)

30

¶39    The State then argues that National's reservation of rights was nonetheless improper because, citing a footnote in *Schwan*, an insurer may recoup defense costs only where, in its words: "(1) the claim itself is not potentially covered; (2) the insurer nonetheless offers to defend and timely asserts a right to recoup; and (3) the insured accepts the offer." The State's position that recoupment of costs is limited to claims "not potentially covered" arises from an over-reading of the *Schwan* footnote, wherein we addressed the "mixed-action" rule requiring an insurer to defend on all counts of a complaint as long as one count "potentially triggers coverage," citing *Buss v. Superior Ct.*, 939 P.2d 766, 774-75 (Cal. 1997). *Schwan* did not address recoupment of defense costs. As the District Court reasoned, "*Schwan* did not address any issue related to the reservation of rights or reimbursement of defense costs," and "the Montana Supreme Court did not hold—either in the footnote referencing *Buss* or elsewhere in its Opinion—that an insurer may obtain reimbursement only for defense costs for claims not potentially covered." Such a rule would not be consistent with the development of Montana law.[7]

¶40    "[T]he action we have repeatedly admonished insurers to take if there is a coverage question [is to] defend the insured and file a declaratory judgment action to discern coverage." *Freyer*, ¶ 37; *Staples*, ¶ 28 (if the insurer "wished to dispute coverage, it could have defended Staples under a reservation of rights and later sought judicial determination through a declaratory judgment action to determine whether coverage existed."). We

---

[7] As the District Court put it, "[t]he State has not provided any other Montana case law or legal authority precluding an insurer from reserving its right to recoup defense costs either in whole or pro-rata, no matter whether the claim is 'potentially covered' or 'not potentially covered.'"

explained in *Hanke* that "[a]n insurer should provide the insured a defense under a reservation of rights *if the insurer believes* that a question exists about the boundaries of coverage." *Hanke*, ¶ 25 (emphasis added). We have never restricted the right to reserve coverage questions to those claims that "are not potentially covered," as argued by the State. First, to do so would require the insurer to make unilateral, nonjudicial coverage determinations necessary for reservation decisions within the immediacy of its duty to defend the insured. As we have held, the "broader duty to defend requires an insurer to *act immediately* to defend the insured from a claim. The insurer must do so on the basis of mere allegations that could implicate coverage, if proven." *Freyer*, ¶ 37 (emphasis added). In contrast, "the narrower duty to indemnify typically involves complicated interpretational questions that often require legal opinions and separate declaratory actions to determine." *Freyer*, ¶ 37. The answers to these "complicated interpretational questions" may well not be known at the time a claim arises, and thus we compel insurers to "act immediately to defend the insured" until such determinations can be made. *Freyer*, ¶ 37. As noted above, an insurer must initially defend the insured unless it can "unequivocally demonstrate" a claim falls outside policy coverage, or when a mixed action presents both covered and noncovered claims. *Staples*, ¶ 22. Limiting an insurer's reservation right only to claims "not potentially covered" would largely undermine the rules we have previously recognized for insurers to preserve coverage questions for later resolution.[8]

---

[8] Consistent with our "repeatedly admonishing insurers" to defend the insured and file a declaratory action to resolve coverage questions, is the estoppel rule we have adopted in this context: "Where an insurer, *without reservation* and with actual or presumed knowledge, assumes the exclusive control of the defense of claims against the insured, it cannot thereafter withdraw

¶41 Specifically, regarding recoupment, we have explained:

> The insurer . . . may file a declaratory judgment action to resolve coverage issues. *Staples*, ¶ 28. *The insurer may seek to recover* the expenses that the insurer incurred in defending a claim *outside of the insured's policy coverage* in the declaratory judgment action. *Staples*, ¶ 28. An insurer's failure to follow this course leaves the insurer potentially liable for defense costs and judgments. *Staples*, ¶ 27; § 28-11-316, MCA.

*Hanke*, ¶ 25 (emphasis added); *see also Am. Econ. Ins. Co. v. Aspen Way Enters.*, No. CV 14-09-BLG-SPW, 2015 U.S. Dist. LEXIS 163082, at *5 (D. Mont. Dec. 4, 2015) (quoting *Hanke*) ("If a court declares that there is no coverage, Montana law permits the insurer to 'recover the expenses that the insurer incurred in defending a claim outside of the insured's policy coverage in the declaratory judgment action.'"). We have explained that an insurer may pursue recoupment if it "(1) timely and explicitly reserved the right to recoup the costs; and (2) provided specific and adequate notice to the insured of the possibility of reimbursement." *Ribi*, ¶ 49 (citing *United Nat. Ins. Co. v. SST Fitness Corp.*, 309 F.3d 914 (6th Cir. 2002)).[9]

---

and deny liability under the policy on the ground of noncoverage . . . ." *Safeco Ins. Co. v. Ellinghouse*, 223 Mont. 239, 245, 725 P.2d 217, 221 (1986) (citing 14 Couch on Insurance 2d, § 51.85 (2d ed. 1982)) (emphasis added). Here, National did not fail to reserve its coverage issues.

[9] As noted by the Concurrence, we did not incorporate in the analysis the fact that Travelers and Ribi had agreed to recoupment as to one group of plaintiffs, and that Ribi had not objected to recoupment in the other plaintiffs' cases. *Ribi*, ¶ 10. Further, *Hanke* involved only the recoupment of an indemnity payment, not defense costs, despite the opinion's language regarding filing a declaratory judgment action to recover "expenses" that an insurer incurred in defending a claim outside of a policy's coverage. *See Hanke*, ¶¶ 25-28, 31. Because the parties have not argued here that these cases should be revisited regarding the propriety of recouping defense costs, for the purposes of this Opinion we assume it is permissible under the holdings of those cases.

¶42 While we have also made general statements such as "an insurer [may] recover defense costs *when the insurer had no duty to defend*," *Ribi*, ¶ 48 (emphasis added), in context such statements were referring to ultimate indemnity determinations of whether coverage and the accompanying duty to defend existed under the policy as a matter of law, not the initial duty to immediately defend "when an insured sets forth facts that present a risk that possibly would be covered by the terms" of the policy. *Hanke*, ¶ 24. In other words, the scope of an insurer's right of recoupment is determined by subsequent judicial ruling on the law and the policy, not by the potential implication of coverage that obligates the insurer to immediately defend the insured. *See* 44 Am. Jur. 2d Insurance § 1405 ("Where the insurer is doubtful about its liability and wishes to retain all its rights and at the same time protect itself against the claim that it has unjustifiably refused to defend a suit against the insured, it may give a so-called 'nonwaiver' notice to the insured or attempt to enter into a 'nonwaiver' agreement with the insured, by which it reserves all its rights to later assert the policy noncoverage"); and 44 Am. Jur. 2d Insurance § 1422 ("An insurer does not waive the right to later disclaim liability by voluntarily defending its insured to a final judgment or settlement . . . where the insurer executes an express nonwaiver agreement with the insured or defends under a reservation of rights.").

¶43 The State also argues National failed to *timely* reserve the right of recoupment, but National asserted the right continuously throughout the litigation, even before May 2006, and prior to National receiving a request from the State to make any defense payments. The State offers that the insured "must accept the offer" of a defense subject to the

reservation, but this is incorrect. "[E]ven absent an express agreement by the insured," the right to recoupment is enforceable if the insurer satisfies the requirements of explicit reservation and timely notice to the insured. *Ribi*, ¶¶ 49-50 (citing *United*, 309 F.3d at 921); *Aspen Way Enters.*, 2015 U.S. Dist. LEXIS at *6 ("Such a reservation of rights is 'enforceable where an insurer meets these conditions even absent an express agreement by the insured.'") (quoting *Ribi*, ¶ 49). As noted above, an insurer may reserve issues by entering an agreement with the insured but may also unilaterally reserve issues if the insured does not agree.

¶44 We thus affirm the District Court's determination that National did not breach the duty to defend by the reservation of rights made with its offer of a full defense in May 2006.[10]

*d. Duty to Defend: 2006-2012*

¶45 The District Court determined that, despite offering a full defense and satisfying its duty to defend in May 2006, National nonetheless committed a second breach by its actions thereafter, reasoning that "National breached its duty to defend the State by failing to file a declaratory judgment expeditiously when the State rejected its offer to defend each of the Libby Claims tendered and waiting until after the first global settlement." National argues this is error, as it "timely commenced this proceeding," and that the State has cited no

---

[10] We recognize that obligations here discussed also implicate the provisions of the Unfair Trade Practices Act (UTPA), Title 33, chapter 18, MCA, which are not before us in this case. *See Draggin' Y Cattle Co. v. Junkermier, Clark, Campanella, Stevens, P.C.*, 2019 MT 97, ¶ 31, 395 Mont. 316, 439 P.3d 935 (noting that these issues "underscore the reason for a separate framework for presenting such claims in a UTPA action.").

"Montana precedent requiring immediate commencement of a declaratory action after an insurer offers to defend under reservation," because "[n]one exists." Rather, National points to multiple holdings in which we have declined to impose such an obligation upon insurers before resolution of the underlying liability case. *See Draggin' Y* ¶ 38 ("We decline to impose as a matter of law a new obligation on a defending insurer . . . to file a declaratory judgment action *before the resolution of the liability case*") (emphasis added); *Freyer*, ¶ 37 ("it is appropriate for insurer to institute declaratory action *after insured suffers loss* so insurer can determine whether the company is obligated to pay all or any part of the judgment or loss.") (emphasis added, internal citation and quotation omitted). National argues that, after properly defending in May 2006, it conducted "multiple rounds of mediation" with the State over coverage issues, contributed to the 2009 Global Settlement, and entered a Tolling Agreement with the State in 2010 "to preserve the status quo."

¶46 While we acknowledge National's citation of our general rule about the timing of a declaratory action, we must also consider the extraordinary and unprecedented circumstances here. National learned of the Libby Claims, and its duty to defend arose, in July 2002. After initially breaching its duty in 2005, National properly offered a defense in 2006. However, the State rejected the terms of National's defense offer, and while we have now concluded that National's reservation of rights was not a breach of its defense duty, the State thereafter, for years, continued to conduct all of the "on the ground" logistical work in defense and settlement of the claims under its rejection of National's

36

offer, with no certainty about how National's reserved coverage issues would ultimately be resolved. As the District Court insightfully reasoned:

> Notwithstanding the discussions the parties may have had regarding settlement of the coverage issues, National knew the State specifically had rejected National's offer of a defense subject to any reservation of right for reimbursement of defense costs. National did not file a declaratory judgment action for another six years. During that time, National did not take any steps to stay the pending Libby Claims, or prevent the State from being otherwise prejudiced. The State proceeded to provide defense of the various Claims as they were filed, including the settlement of a number of those Claims. National has not actively participated in nor contributed to any of the settlements of Libby Claims subsequent to the global settlement . . . .
>
> Given the emphasis on the obligation to provide an insured a defense, even if under a reservation of rights, the Court concludes it is even more imperative for an insurer to file a declaratory judgment action where its insured has exercised the right to refuse a defense subject to a reservation of rights.

In the three years following its rejection of National's defense offer in May 2006, the State was presented with a request from the Libby Claimants for global negotiations, participated in negotiations leading to the November 2009 Global Settlement, therein making decisions with multi-million dollar consequences, and then sought and obtained judicial approval of the settlement in September 2011—all with no resolution of National's reserved coverage rights in sight, not even a pending declaratory action. Thereafter, the State has continued to defend and negotiate settlements. It took National six years after the State's rejection of its 2006 defense offer, almost 10 years after notice of the claims, and four years after National acknowledged to the State the need for a "judicial determination," to initiate this action. The following counsels well regarding the timeliness of an insurer's obligation in these circumstances:

> Where an insured refuses to consent to a defense under a reservation of rights, the insurer must thereupon give the insured proper unilateral notice of its reservation of rights, take the necessary steps to prevent the main action from going into default or to prevent the insured from being otherwise prejudiced, *and seek immediate declaratory relief* including a stay of the main case pending a final resolution of the declaratory judgment action.

44 Am. Jur. 2d, Insurance, § 1422 (citing *Government Employees Ins. Co. v. Progressive Cas. Ins. Co.*, 275 Ga. App. 872 (2005)) (emphasis added). National argues that the parties entered the Tolling Agreement to "preserve the status quo" and "defer commencement of coverage litigation," but the Tolling Agreement did neither; it merely tolled the statutes of limitation on the parties' claims against each other. It did not defer litigation or require the then-status to be maintained. It was not entered until after the State negotiated the 2009 Global Settlement.

¶47   Before this action was filed, National contested the limits of its coverage for nearly a decade. This action, which attempted to resolve the coverage issue, took nearly another decade itself. Given the complexity of the coverage issues, the age of the policy, and the number of potential claimants involved here, litigation of this length was foreseeable. A declaratory judgment's purpose is to discern the extent of coverage under a policy so that an insurer may know the extent of its legal duties relative to the insured. *Freyer*, ¶ 37 (collecting cases). It is not a Sword of Damocles to be hung over the insured's head throughout the entire course of litigation. In the end, National delayed so long as to prejudice the State by forcing it to litigate and settle cases in coverage darkness. While there is no categorical rule imposing an obligation on an insurer to file a declaratory judgment action within a certain amount of time, *Draggin' Y*, ¶ 38, we cannot, given these

38

facts, ignore the effect such a decision has on the insured. *Cf. Rolan v. New W. Health Servs.*, 2017 MT 270, ¶¶ 19-24, 389 Mont. 228, 405 P.3d 65 (recognizing that extreme time delays in filing resulting in the opposing party expending substantial effort and expense, coupled with a lack of reasonable justification for the delay, can prejudice the opposing party). We affirm the District Court's holding that, under these circumstances, National breached the duty to defend by its many-year delay in seeking judicial resolution of its reserved coverage issues.

*e. Breach and Estoppel*

¶48 Having addressed the breaches of the duty to defend, we take up National's estoppel arguments. The District Court held that, "[h]aving determined that National breached its duty to defend the State, it is clear under Montana case law that National is estopped from denying coverage—and therefore from asserting any defenses to coverage." National first argues the District Court "erroneously estopped National from contesting coverage for the State's $43 million 2011 Global Settlement." National argues that, regardless of any breach of the duty to defend, estoppel is not applicable without "detrimental reliance," citing *Grimsrud v. Hagel*, 2005 MT 194, ¶ 36, 328 Mont. 142, 119 P.3d 47, and that the State "did not rely to its detriment on any actions by National" or "even allege that National's conduct harmed the State or its defense." Secondly, National contends the District Court "erroneously created coverage by estoppel" because estoppel cannot create coverage where none exists, and thus the State was permitted to avoid its burden to establish the Libby Claims fell within "the basic scope of coverage" under the Policy. The

State responds that the District Court properly concluded that breach of the duty to defend renders National responsible for all consequential damages from the breach.

¶49 National's arguments are essentially attempting to restore its coverage defenses despite the determination it twice breached the duty to defend. *Grimsrud* referenced general estoppel principles drawn from case authority that did not involve a breach of the duty to defend, including *Selley v. Liberty Northwest Ins. Corp.*, 2000 MT 76, ¶ 10, 299 Mont. 127, 998 P.2d 156, which delineated the "six elements [] necessary in order to establish an equitable estoppel claim," including detrimental reliance. *Grimsrud*, ¶ 36. However, *Grimsrud* determined the duty to defend had not been breached in the first place, and thus, estoppel would not have applied there. *Grimsrud*, ¶ 34. More to the point, our extensive precedent involving an insurer's breach of the duty to defend has not applied or required satisfaction of the general "six element" equitable estoppel test to determine if an insurer is estopped from raising coverage defenses, and we will not require it here. Such a requirement would spawn extensive further litigation to determine whether estoppel should result from an insurer's breach. Rather, estoppel in this context is comparatively straightforward: "Montana case law clearly provides that where the insurer refuses to defend a claim and does so unjustifiably, that insurer becomes liable for defense costs and judgments." *Staples*, ¶ 20 (internal quotations and citation omitted); *see also J & C Moodie*, ¶ 21 (citations omitted). Estoppel is applied without regard to coverage defenses or considerations. Thus, the District Court did not err by estopping National's coverage defenses in consequence of its breaches of the duty to defend.

*f. Consequences of National's Breaches of the Duty to Defend*

¶50    For the first breach of the duty to defend, which it dated on July 18, 2005, the District Court imposed upon National responsibility for all defense costs and completed settlements incurred "subsequent to that date" for which "National has not provided a full defense as of the date each settlement was approved" by the courts, without regard to coverage defenses and "irrespective of Policy limits."  For the second breach, which it dated on February 23, 2012, the date this action was filed, the District Court held that "as to those claims which were tendered and settled prior to February 23, 2012, National is estopped from raising coverage defenses, and is responsible for defense costs and all settlement amounts."  Thus, the District Court estopped National from asserting coverage defenses, and assessed the defense costs, with interest, on claims the State defended without a full defense offer from National during that period and assessed settlement costs during that period.  As a result, National was assessed the $43 million 2009 Global Settlement, prejudgment interest thereon of $21.3 million, $6.87 million in defense costs, and prejudgment interest thereon of $4.9 million, for a total of $76.07 million.  Against this amount, National was credited $16.1 million for its contribution to the Global Settlement, resulting in the inclusion of the net amount of approximately $60 million in the Judgment. We affirm this portion of the judgment as related to the duty to defend.[11]

¶51    The District Court withheld sets of claims from its application of estoppel, for which it permitted National to raise defenses under the Policy.  In its March 2019 Order regarding

---

[11] We separately address the pre-judgment interest portion of the Judgment below.

41

"Fully Defended Claims," the District Court explained that claims "tendered subsequent to May 10, 2006" for which National "offered a full defense" were not subject to estoppel. Likewise, claims tendered "but not settled or reduced to judgment prior to February 23, 2012" were not eligible as estopped settlement costs. The District Court thus undertook consideration of coverage issues for these cases, ultimately rejecting most of National's coverage arguments and assessing $29.58 million in settlement costs, $4.86 million in pre-judgment interest, and $3.57 million in attorney fees and costs for this declaratory case, for a judgment total of approximately $38 million related to National's indemnity obligations. To review this portion of the judgment, we turn below to the coverage issues raised on appeal and cross-appeal.

¶52    In that regard, coverage issues are also pertinent to the Claims described by the District Court as "those tendered subsequent to the February 23, 2012, filing of the declaratory action," or sometimes referred to as the "Future Claims." As the District Court explained, since the filing of this action, "many more Libby Claim cases have been filed, and continue to be filed . . . . Most of these claims have been settled by the State while this declaratory judgment action has been litigated, but a few claims remain pending." Although the number of post-February 23, 2012, claims are not clear from the record, the State's briefing states that, "since this action was filed, approximately 1500 claims have been filed," and the State has settled claims "totaling an additional approximately $44 million." However, no findings were entered about the Future Claims, and the specific amounts were not included in the Judgment.

¶53    *2.  Did the District Court err in its determinations regarding coverage under the general liability policy issued by National to the State?*

¶54    "The interpretation of an insurance policy presents a question of law, and we will review the District Court's legal conclusion for correctness." *Emp'rs Mut. Cas. Co. v. Fisher Builders, Inc.*, 2016 MT 91, ¶ 9, 383 Mont. 187, 371 P.3d 375 (quoting *Landa v. Assurance Co.*, 2013 MT 217, ¶ 13, 371 Mont. 202, 307 P.3d 284); *see also Ribi*, ¶ 14 (citing *Pablo v. Moore*, 2000 MT 48, ¶ 12, 298 Mont. 393, 995 P.2d 460).  "General rules of contract law apply to insurance policies and we construe them strictly against the insurer and in favor of the insured." *Ribi*, ¶ 17 (citing *Erickson v. Dairyland Ins. Co.*, 241 Mont. 119, 123, 785 P.2d 705, 707-08 (1990)).  "The language of a contract governs its interpretation if that language is clear and explicit." *Heggem v. Capitol Indem. Corp.*, 2007 MT 74, ¶ 22, 336 Mont. 429, 154 P.3d 1189 (citing § 28-3-401, MCA).  "Courts must look at an insurance contract as a whole and attempt to reconcile the various parts to give each meaning and effect." *Heggem*, ¶ 22 (citing *Farmers Alliance Mut. Ins. Co. v. Holeman*, 1998 MT 155, ¶ 25, 289 Mont. 312, 961 P.2d 114); *accord* § 33-15-316, MCA.  "Courts give the terms and words used in an insurance contract their usual meaning and construe them using common sense." *Ribi*, ¶ 17 (citing *Hardy v. Progressive Specialty Ins. Co.*, 2003 MT 85, ¶ 14, 315 Mont. 107, 67 P.3d 892).  "[E]xclusions from coverage will be narrowly and strictly construed because they are contrary to the fundamental protective purpose of an insurance policy." *Town of Geraldine v. Montana Mun. Ins. Auth.*, 2008 MT 411, ¶ 17, 347 Mont. 267, 198 P.3d 796 (quoting *Swank Enterprises v. All Purpose Services*, 2007 MT 57, ¶ 27, 336 Mont. 197, 154 P.3d 52).  Typically, the insurer and

43

insured hold respective burden of proofs in seeking the benefit of a particular policy provision (*e.g.* coverage, exclusions, and exceptions to exclusions). *Ribi*, ¶ 29.

*a. Known loss*[12]

¶55 National contends coverage is not available under the Policy because the Libby Claims were a "known loss," arguing that the State "was aware at policy inception that a loss would likely ensure," and quoting from the language in *Orr*, where we stated:

> Plainly, the State *knew* as a result of its inspections that the Mine's owner was doing nothing to protect the workers from the toxins in their midst. The question of whether the risks were foreseeable had been answered as early as 1956; the dangers to the workers were already clear and present by that time.

*Orr*, ¶ 37.

¶56 The District Court, reasoning the State was required to have knowledge of *potential liability* to bar coverage under the known loss doctrine, held that, as of July 1, 1973, when the Policy was issued, "there would have been no reason for the State to anticipate that it would be liable for any acts or omissions it committed prior to July 1, 1973 under the then-operative provision" of the 1972 Montana Constitution, which removed immunity only for "causes of action arising *after* July 1, 1973." (Emphasis added.) *See* Mont. Const. art. II, § 18. This limitation on immunity was later eliminated by legislative referendum

---

[12] The known-loss doctrine is not based upon a provision of the Policy, but a common law principle which courts have imposed upon liability policies as part of, as cited in Intervenors' briefing, "the principle of fortuitousness," which requires that losses arise without the insureds' knowledge. Citing cases and treatises, Intervenors explain that, "[e]ven where the insurance policy contains no language expressly stating the principle of fortuitousness, courts read this principle into the insurance policy . . . ." The principle is likewise a part of contractual provisions regarding accident and occurrence.

44

effective July 1, 1975, the same day that National cancelled the Policy. SJR No. 64, L. 1974. National argues the District Court misapplied the known-loss doctrine, because the question is not whether the insured had knowledge of *potential liability*, but whether it had knowledge that a *loss* would likely ensue, and that the State did.[13]

¶57 The State acknowledges the Underwriting Packet given to prospective insurance bidders in 1973 did not mention the State's then-knowledge of asbestos-related conditions at the Libby Mine, but that, when sovereign immunity ended on July 1, 1973, the Claimants' injuries were unknown to the State as well as to the Claimants, no claimant had been diagnosed with asbestos-related injuries (which did not occur until approximately 25 years after the Policy was issued), and no allegation of wrongdoing had been made against the State. The State argues that, even by 2004, when *Orr* was decided, no claimant had established the State had breached its duty to the Claimants, and thus, "a possible claim for alleged multiple failures to warn cannot retroactively be imputed to have been a 'known liability' decades before the Claims were made."

¶58 "[I]t is well-accepted that insurance does not cover known losses." *ALPS Prop. & Cas. Ins. Co. v. Keller, Reynolds, Drake, Johnson & Gillespie, P.C.*, 2021 MT 46, ¶ 15, 403 Mont. 307, 482 P.3d 638 (citing *Interstate Fire & Cas. Co. v. Abernathy*, 93 So. 3d 352, 359 (Fla. Dist. Ct. App. 2012) ("An agreement to assume a known loss is not insurance.")). "[O]ne may not obtain insurance for a loss already in progress, or for a loss

---

[13] However, National argued to the District Court that "the legal inquiry under the known loss doctrine turns on whether the State knew of *potential liabilities* at the time it purchased insurance from National." (Emphasis added.)

45

that the insured either knows of, planned, intended or is aware is substantially certain to occur." *Keller*, ¶ 15 (quoting 43 Am. Jur. 2d Insurance § 469). In this regard, there is a difference between a risk that is *foreseeable*, recognized in the *Orr* quote offered by National, and a loss that is *known*. Our further explanation in *Orr* demonstrates the nature of what then remained an uncertain loss involving the latent development of injury:

> [T]his is a case with complex legal issues. The difficult questions presented by industry standards forty years old and the unusual delayed onset of the Miners' injuries advance novel questions of law . . . . The simple truth is that the law attendant to these facts is both untested and arguably susceptible to different interpretations. Contrary to the dissent's insistence, we have not handed the Plaintiffs a remedy--they still face the daunting task of establishing that the State breached its duty to them and in so doing, caused their damages and injuries.

*Orr*, ¶ 81.[14]

¶59 National's arguments about the State's knowledge are largely divorced from historical factual context. For the many years of its regulatory involvement at the Libby Mine, the State was an instrument for good, the only on-site actor with no other motive but to enhance safety. That the State's actions could be declared, decades later, because of the manner in which it handled notification of the hazards, to be not helpful, but harmful to thousands of people, was not only unexpected, it was incomprehensible. It was certainly

---

[14] Despite the language from *Orr* cited by the Dissent, the issue in *Orr* was more narrow—only whether the State owed a duty to the miners in the first place and whether a suit to determine breach and damages, which the Court described as a "daunting task," could proceed. *See Orr*, ¶¶ 37-40, 81-82. To the extent the *Orr* Court commented on foreseeability, causation, or what the State "knew" at the time, those discussions were premature and could properly be regarded as dicta—the Court's decision establishing the State's duty was ultimately based on statute. *See Orr*, ¶ 38-40.

not a loss the State even suspected was "substantially certain to occur." *Keller*, ¶ 15.  We

agree with the State and affirm the District Court's ruling, although on different grounds.

*b.  Pollution exclusion*

¶60    The Policy excludes coverage for:

> bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

¶61    The question presented in this issue is whether the pollution exclusion applies to

and excludes coverage for pollution discharges only by the *insured*, or more broadly to also

exclude coverage for discharges by *third parties* for which liability is imposed upon the

insured.  The District Court reasoned the "arising out of" phrase rendered the provision

ambiguous, citing to our decisions finding the phrase to be ambiguous within policies

applied in other contexts, and that "the average consumer unversed in the law or insurance

business . . . would expect that the exclusion only applies if it is the insured that was directly

responsible for the pollution."  It also reasoned the exclusion "does not clearly and

unambiguously exclude coverage for the 'failure to warn' claims against the State."  In

challenge, National argues the plain wording is unambiguous and draws no distinction

between an "active polluter" insured and an insured who becomes liable for damages

caused by a third-party active polluter, and the provision should be enforced exactly as

written.  The State argues the provision is ambiguous and notes we have held that

exclusions from coverage "must be clear and unequivocal" and "will be narrowly and

strictly construed," citing *Winter v. State Farm Mut. Auto. Ins. Co.*, 2014 MT 168, ¶ 13, 375 Mont. 351, 328 P.3d 665, and *Marie Deonier & Assocs. v. Paul Revere Life Ins. Co.*, 2000 MT 238, ¶ 45, 301 Mont. 347, 9 P.3d 622.[15]

¶62     National's "plain reading" interpretation is troublesome when the entire provision is considered.  National's argument and its quotation of the exclusion in its briefing omits the last clause, which is the exception to the exclusion for discharges that are "sudden and accidental."  *See Ribi*, ¶¶ 30-37.  As noted by Intervenors, if the exclusion was meant to apply to pollution discharges by third parties, then it creates a coverage distinction between discharges that are knowing or intentional, and those that are sudden and accidental, which leads to an absurd or nonsensical coverage result:  the insured would be covered for liability arising from a failure to warn of a "sudden and accidental" discharge—a seeming impossibility, given that sudden accidents necessarily occur without warning—but would *not* be covered for liability arising from a failure to warn of an ongoing, intentional discharge.  *See Young v. Hammer, Hewwitt, Jacobs & Floch, PLLC*, 2021 MT 180, ¶ 18, 405 Mont. 65, 491 P.3d 725 (the language of an insurance policy "is to govern its interpretation if the language is clear and explicit and does not involve an absurdity," citing

---

[15] While not determinative of the issue here, we reviewed and applied this exclusion in *Ribi*.  We noted the CGL policy's intent was to "insure the acts or omissions of the insured," and that the insured bears the burden of discovering the ultimate effect of "its disposed wastes" and providing the necessary information regarding "its activities" for application of the "sudden and accidental" exception to the exclusion.  *Ribi*, ¶¶ 18, 30-32.  We certainly assumed, without deciding the interpretational question at issue here, that the exclusion was directed to pollution discharges by the insured, similar to the District Court's reading of it as a matter of common consumer understanding.  National argues the provision applies *both* to discharges by insureds and by third parties.

§ 28-3-401, MCA). Consequently, we conclude that applying the exclusion to the discharges of third parties is not a reasonable reading of the provision. "An insurance contract is ambiguous if it is 'reasonably subject to two different interpretations.'" *Modroo v. Nationwide Mut. Fire Ins. Co.*, 2008 MT 275, ¶ 23, 345 Mont. 262, 191 P.3d 389 (citation omitted). Here, only the State's reading is reasonable. *See Heggem*, ¶ 42 (plaintiff did not show that policy provision was "reasonably subject to two or more interpretations.").

¶63 Further, courts that have addressed a regulator's failure to warn of pollution discharges have declined to apply this exclusion to the insured government entity. *See WTC Captive Ins. Co., Inc. v. Liberty Mut. Fire Ins. Co.*, 549 F. Supp. 2d 555, 563 (S.D.N.Y. 2008) (exclusion did not exclude coverage for claims against New York City for failing to share information about asbestos test results); *Covington Township v. Pacific Employers Ins. Co.*, 639 F. Supp. 793, 799–800 (M.D. Pa. 1986) (exclusion did not exclude coverage for failure-to-warn claims against town); *Niagara Cty v. Utica Mut. Ins. Co.*, 439 N.Y.S.2d 538, 541–42 (App. Div. 1981) (exclusion did not exclude coverage for County's failure to warn about industrial toxic waste). We affirm the District Court on alternate reasoning.

*c. Occurrence/intentional act*

¶64 The Policy provides coverage for damages the insured becomes legally obligated to pay caused by an "occurrence," which is defined as:

> an event, or a continuous or repeated exposure to conditions, which results in bodily injury or property damage during the policy period that is neither knowingly nor intentionally caused by or at the direction of the insured[.]

49

¶65    National argues the State is not entitled to coverage pursuant to this provision because "its decision to conceal its knowledge of the Libby asbestos hazard was knowing and the resulting harm . . . was 'within the expectation' of the State." (Citing *Northwestern Nat'l Casualty Co. v. Phalen*, 182 Mont. 448, 597 P.2d 720 (1979).)

¶66    In *Phalen*, we interpreted an "occurrence" policy provision to mean "that it precludes coverage for bodily injuries or damages, though not specifically intended by the insured, if the resulting harm was within the expectation or intention of the insured from his standpoint." *Phalen*, 182 Mont. at 459, 597 P.2d at 726; *Portal Pipe Line Co. v. Stonewall Ins. Co.*, 256 Mont. 211, 216, 845 P.2d 746, 749 (1993); *see also Fisher Builders*, ¶¶ 12-20 (discussing cases involving "occurrence" and "accident" policy terms). The inquiry is "1) whether the act itself was intentional, and 2) if so, whether the consequence or resulting harm stemming from the act was intended or expected from the actor's standpoint." *Fisher Builders*, ¶ 15. The second prong "is an objective inquiry." *Fisher Builders*, ¶ 19.

¶67    *Orr*'s indictment of the State's actions as leading to foreseeable harm lends itself to the argument that the State, at the least, should have expected the hazards of asbestos would result in injury if it failed to warn. However, an objective inquiry of the entire record demonstrates otherwise. First, while the State was sued by Claimants for its failure to warm *them*, the State did not fail to warn entirely. Even *Orr* explained that "[t]he State notified Zonolite, and later Grace, of the dangerous conditions after each inspection . . . and [told] the Mine's owners/managers to correct the problems." *Orr*, ¶ 6. In turn, Grace

50

provided the State's inspection reports to the workers' Union. Various inspection agencies advised that the hazards could be managed by lowering asbestos levels to what was believed to be safe at the time, and by the use of worker protective equipment, including respirators. In 1964, even as it described the situation at the mine as "serious," the Union thanked the State for its efforts and acknowledged considerable progress. While the State has now, decades later, been faulted for the manner in which it handled the disclosure of the health hazards, it did not, contrary to National's argument, "conceal its knowledge" about the hazards. Indeed, National's initial assessment of the failure to warn claims against the State was that liability "was highly questionable," and that it "[did] not believe the State was negligent." Further, as State notes, this issue is not a determination of mere foreseeability:

> The insured may be negligent indeed in failing to take precautions or to foresee the possibility of harm, yet insurance coverage protects the insured from his own lack of due care. If coverage is lost for damage which a prudent person should have foreseen, there would be no point to purchasing a policy of liability insurance.

*Armstrong World Indus., Inc. v. Aetna Cas. & Sur. Co.*, 52 Cal. Rptr. 2d 690, 721 (1996). We conclude the District Court did not err by holding that the State did not objectively intend or expect injuries to be sustained as a result of its actions, and therefore qualified as an "occurrence" under the Policy.

*d. Number of Occurrences and the Coverage Limits*

¶68 The Policy contained a Single Limit Endorsement providing that "Bodily Injury Liability" was subject to a $3 million limit per occurrence, to be applied "[r]egardless of

51

the number of . . . persons or organizations who sustain bodily injury," of the number of "claims made or suits brought on account of bodily injury." Noting that "event" within the Policy's definition of "occurrence" was not defined in the Policy, the District Court reasoned that "the number of occurrences should focus on the number of occasions when injury is caused." Rejecting both National's and the State's interpretations of the Policy, the District Court adopted the argument of Intervenors that "there is a different 'occurrence' for each of a given Libby Claimant's aggregated exposure to asbestos that were distinct from the time, location, routes, and circumstances of the exposures of other Libby Claimants."[16]

¶69    National argues that "the Libby Claims constitute, at most, one occurrence because they stem from *one cause*: the State's singular decision to conceal its knowledge of asbestos conditions in Libby in reliance on a 1942 Attorney General Opinion," and that the "number of claims or injuries stemming from this one cause is wholly irrelevant." In answer, the State contends its "potential liability is not based on a single decision to follow an Attorney General's opinion, but on multiple alleged failures to disseminate information contained in separate inspection reports at different times over two decades with different information in each report."

---

[16] Applying the Policy's aggregation clause, which provides that injuries from "continuous or repeated exposures" to injurious conditions must be aggregated in a single occurrence, the District Court concluded that "for a given claimant, the combined exposures during his or her unique history should be aggregated into a single occurrence." Thus, a single claimant's multiple exposures would constitute a single occurrence. Nonetheless, the District Court's ruling results in thousands of occurrences, for which policy limits, in this case, would be in the uncalculated billions of dollars.

¶70    In *Heggem*, we adopted the "cause theory" for the interpretation of "occurrence,"

explaining that:

> [i]n interpreting the term "occurrence" as used in liability policies which
> limit the insurer's liability to a specified amount per "occurrence," the vast
> majority of courts view it from the perspective of causation—referring to the
> cause or causes of the damage or injury—and not the number of injuries or
> claims.

*Heggem*, ¶ 31 (citing *CSX Transp., Inc. et al. v. Continental Ins. Co.*, 343 Md. 216 (Md.

1996), *Michigan Chem. Corp. v. Am. Home Assur. Co.*, 728 F.2d 374, 379 (6th Cir. 1984),

and Michael P. Sullivan, *What Constitutes Single Accident or Occurrence Within Liability*

*Policy Limiting Insurer's Liability to a Specified Amount Per Accident or Occurrence*, 64

A.L.R. 4th 668 (2005)).

¶71    The State utilizes cases cited in *Heggem* to urge the proper method of calculation of

occurrences in this case.  In *American Indem. Co. v. McQuaig*, 435 So. 2d 414 (Fla. Dist.

Ct. App. 1983), a mentally ill person discharged a shotgun three times, injuring two police

officers.  Applying the cause theory to determine the number of occurrences, the court

determined the mental illness was not the cause of the injuries, but the three separate shots

that were fired, each being an occurrence.  *McQuaig*, 435 So. 2d at 415-16.  The same

result was reached in the similar case of *New Hampshire Ins. Co. v. RLI Ins. Co.*, 807 So.

2d 171 (Fla. Dist. Ct. App. 2002) (three gunshots fired by a condominium resident, each

injuring a different person, constituted three occurrences).  In *U.E. Texas One-Barrington,*

*Ltd. v. General Star Indem. Co.*, 332 F.3d 274 (5th Cir. 2003), the court determined,

pursuant to the cause theory, that 19 water damage incidents in an apartment complex,

caused by 19 different leaks, constituted 19 occurrences under the policy. *See also Michigan Chem. Corp.*, 728 F.2d at 379 (each shipment by insured of mislabeled livestock feed, which caused injury, were a separate occurrence, and not the underlying mislabeling).

¶72    The State and National agree the Libby Claimants have alleged that each failure to directly disseminate the results of each inspection report to them is a failure to warn by the State.    The State argues, however, that National's position incorrectly blames the *underlying reason* for the failures to warn—the State's decision to follow the Attorney General's opinion—instead of the failures themselves, the approach rejected in *McQuaig*, where the insurer attempted to blame the underlying mental illness instead of the three causative actions—the separate gunshots. *McQuaig*, 435 So. 2d at 415–16.  The State offers that each of its failures to disclose the inspection reports, some 21 in total, are separate occurrences, and further indicate that 14 of these alleged failures "involve reports by the State after a 1967 statutory amendment mooted the AG opinion" or were reports to which the Attorney General opinion did not apply.[17]

¶73    We agree the cause of injury here is not the State's "singular decision" to follow the Attorney General's opinion, but its separate failures to warn.  Although the Attorney General's opinion may provide an explanation as to why the State failed to warn, that does not change the fact that the Libby Claimants' injuries at issue here were not caused by that

---

[17] The State welcomes the District Court's ruling, although its briefing explains the position it took below: "In the District Court, the State argued the number of occurrences equaled the number of its alleged failures to warn, based on language appearing to suggest this in the majority and concurrence in *Heggem*." *State of Montana's Answer and Cross-Appeal Brief*, p. 51, n.15.  It also primarily argues this theory on appeal.

opinion. Rather, the State's multiple decisions over the course of more than a decade to withhold certain information caused the claimants' injuries. Likewise, we cannot reconcile the District Court's holding with our precedent applying the cause theory to the determination of occurrence, which also rejected an "effects" test premised upon "the number of injuries or claims." *Heggem*, ¶¶ 28, 31, 39, 40, 44. As we stated about this Policy in *Ribi*, "[t]he CGL policy's intent is to insure *the acts or omissions of the insured*, including intentional acts . . . ." *Ribi*, ¶ 18 (emphasis added). In this regard, our analysis in *Ribi* determined the "relevant event" for purposes of the policy's application, which we concluded was "Ribi's disposal of hazardous wastes." *Ribi*, ¶¶ 16, 37. Here, the acts of the insured constituting the "relevant events" are the State's failure to warn the Libby Claimants of their hazardous exposure to asbestos.[18]

¶74     However, having so concluded, we cannot on this record take the next step and declare the number of occurrences, or the number of instances the State failed to warn the Libby Claimants. While there are passing references to the number of those occasions, the issue was not litigated to a conclusion in the District Court, which entered no findings. Consequently, we reverse the District Court's ruling and must remand for further proceedings to resolve this factual issue.

*e. Proration of settlement and defense costs*

---

[18] As the State explains, under the Policy's definition of occurrence, its failure to warn is an "event" occurrence, not a "a continuous or repeated exposure to conditions" occurrence.

¶75 The District Court ruled that National properly reserved the issue of pro rata allocation of defense and settlement costs for resolution within the coverage litigation, and addressed the merits of the issue, concluding the Policy did not permit allocation of covered costs between National and the State premised upon the two-year period of the Policy and the years the State operated a self-insured plan.[19]

¶76 National argues the Policy indeed requires pro rata allocation, and that such cost distribution has been approved as a principle of Montana insurance law by the courts, particularly for allocation of defense costs. Noting that "occurrence" is defined in the Policy as an event "which results in bodily injury . . . *during the policy period,*" National argues its indemnity obligation is limited to bodily injury damages "that took place during the two years that National provided coverage." Noting such decisions as *Am. Simmental Ass'n v. Coregis Ins. Co.*, 282 F.3d 582, 589 (8th Cir. 2002) ("Montana law requires [allocation of] defense costs pro rata"), National argues the District Court erred by relying on the unpublished decision in *Caterpillar, Inc. v. Century Indem. Co.*, No. 3-06-0161, 2007 Ill. App. Unpub. LEXIS 2, at *15 (Feb. 2, 2007), which said that "self[-]insurance is not considered 'other valid and collectible insurance' for purposes of assigning liability between insurance providers and self-insureds for contribution purposes" under the subject policy. *Amici curiae* Complex Claims Insurance Litigation Association and American Property Casualty Insurance Association argue pro rata allocation is a well-established

---

[19] Due to Glacier General Assurance Company's insolvency, its short involvement as the State's insurer prior to the 1976 initiation of the State's self-insurance program is essentially ignored by the parties.

insurance rule in courts across the country, which "upholds principles of fundamental fairness by providing the coverage for which policyholders bargained and paid."

¶77     Our analysis is focused upon the language of the Policy. *Ribi*, ¶ 17. It is notable that the Policy does not contain a provision explicitly addressing and requiring pro rata allocation. "If the insurer wished to limit its liability through a pro rata allocation of damages once a policy is triggered, the insurer could have included that language in the policy." *American Nat'l Fire Ins. Co. v. B & L Trucking & Constr. Co.*, 134 Wash.2d 413, 428 (1998). Likewise, § 33-15-302, MCA, provides that an insurance policy "shall contain the entire contract between the parties," and that the parties may not "make any agreement as to the insurance which is not *plainly expressed* in the policy." (Emphasis added.) Consequently, National and its *amici* must premise their argument for pro rata allocation on the definition of "occurrence." In response, the State and *amici curiae* United Policyholders argue this definition serves to "trigger" coverage in the first place, that is, to require National to pay damages the State becomes legally obligated for because of events "which result[] in bodily injury during the policy period." The State argues that drawing a pro rata requirement from this language "erroneously gives double effect to 'during the coverage period' as limiting both the trigger and the scope and extent of coverage."

¶78     We concur with the State's position. Pro rata allocation is a significant limitation on coverage, but is not expressly provided in the Policy, though it clearly could have been. National's interpretation also ignores and fails to give meaning to the "all sums" language of the coverage provision: "The Company will pay on behalf of the insured *all sums* which

57

the insured shall become legally obligated to pay . . . caused by an occurrence." The cases applying Montana law cited by National involved allocation of defense costs among insurers. "If several insurance policies exist . . . the insured may recover the entire amount from any one of the insurers, in which case the insurer that pays may demand contribution from the other insurers . . . ." 44 Am. Jur. 2d Insurance § 1750. A "self-insured retention does not constitute 'other insurance' for the purposes of allocating responsibility under 'other insurance' clauses." 44 Am. Jur. 2d Insurance § 1750. Although the State is authorized to purchase insurance in satisfaction of its duty to "provide a comprehensive insurance plan for the state," § 2-9-201(2), MCA, it is also authorized to alternatively "accumulate a self-insurance reserve fund sufficient to provide self-insurance for all liability coverages that in its discretion the department considers should be self-insured." Section 2-9-202(3), MCA. The Policy contains an "other insurance" condition, but consistent with these authorities, does not reference self-insurance by the insured. *See Shattuck v. Kalispell Reg'l Med. Ctr.*, 2011 MT 229, ¶ 15, 362 Mont. 100, 261 P.3d 1021 (recognizing the Department of Public Health and Human Services, as a self-insured state agency, is not primarily engaged in the business of insurance.).

¶79 Based upon the language of the policy, which we construe in favor of the insured if ambiguous, *Ribi*, ¶ 17, and the reasons set forth above, we affirm the District Court's holding that the State is not required to share pro rata responsibility for payment of amounts covered under the Policy.

*f. Policy period*

58

¶80     Both National and the State challenge the District Court's ruling regarding what claims qualify to come within the policy period of 1973-1975, another issue arising from the Policy's definition of occurrence, specifically, the phrase "result[ing] in bodily injury or property damage during the policy period . . . ."  The District Court held that each claimant who was "exposed to asbestos during the Policy period" as a result of the State's failure to warn were eligible for the Policy's coverage, and, as explained above, constituted a separate occurrence.  We have reversed the District Court's occurrence ruling, but here we turn to its determination of which Claimants are eligible to come within the Policy period.

¶81     National challenges the District Court's ruling on the basis of our decision in *Murphy v. State*, 248 Mont. 82, 809 P.2d 16 (1991), involving this Policy.  *Murphy* involved claims related to false imprisonment or restraint in the Montana State Hospital and related mental health injuries.  *Murphy*, 248 Mont. at 84, 809 P.2d at 17-18.  Presciently, we referenced the interpretation of "occurrence" by courts in cases involving "delayed manifestation of injury, as in exposure to asbestos," and stated that coverage in such cases "has been allowed if the act causing the injury occurred during the policy period or if the injury initially manifested itself during the policy period."  *Murphy*, 248 Mont. at 86, 809 P.2d at 19.  National argues that claims of mere asbestos exposure during the Policy period fail to meet either part of *Murphy*'s "standard" because 1) the State's "decision to conceal the Libby asbestos hazard" occurred long before the Policy period began, and thus fails to "satisfy the 'act' requirement of *Murphy*"—based upon National's single

59

occurrence theory we have rejected above; and 2) the District Court "failed to conduct the . . . manifestation analysis" required by *Murphy*, even for Claimants exposed during the Policy period.

¶82 National's argument attempts to christen as a "standard" or "rule" our statement in *Murphy*, but that statement was merely referencing two other, more expansive, definitions of occurrence, neither of which would have provided coverage for the claimant there. *Murphy*, 248 Mont. at 86, 809 P.2d at 19. This reference did not constitute a singular rule, was not adopted as a rule, and has not been cited as such in the subsequent 30 years. Thus, *Murphy* did not adopt a rule requiring injury to manifest itself during the policy period, and that case does not resolve the issue here.

¶83 On cross appeal, the State argues the District Court "should also have held that coverage applies to Claimants exposed to asbestos *only prior* to the policy period, because they too suffered ongoing injury during the policy period." (Emphasis added.) Noting the particular nature of the bodily injury here, the State argues, "[b]ecause of the ongoing nature of asbestos injury to these Claimants, all Claimants who inhaled asbestos either before or during the policy period had injury during the policy period." In support of its motion for summary judgment, the State offered expert medical testimony based upon a review of settled claims that Claimants exposed to asbestos before or during the policy period suffered bodily injury during the period of coverage from 1973-1975.

¶84 In *Swank*, we held that the term 'physical injury' for purposes of the subject policy referred to "a physical and material alteration resulting in a detriment," and that a physical

60

injury "can occur 'even though the injury is not diagnosable, compensable, or manifest during the policy period as long as it can be determined, even retroactively, that some injury did occur during the policy period.'" *Swank*, ¶¶ 18, 20 (citing *In re Silicone Implant Litigation*, 667 N.W.2d 405, 415 (Minn. 2003)) (internal quotation marks omitted). While *Swank* concerned a commercial painting project, and thus involved property damage, it cited to *Silicone Implant Litigation*, involving continuous cellular level bodily injury that did not manifest until later in time, for its injury rule. *See Silicone Implant Litigation*, 667 N.W.2d at 415 ("the insured must show that *some damage* occurred during the policy period.").

¶85    We have held herein that the "occurrence" is the State's individual acts of failing to warn the Claimants. The failures to warn alleged against the State occurred during the time period from 1956-1975. None occurred after the two-year Policy period, and many occurred before. However, under the Policy's definition of occurrence as "an event . . . which results in bodily injury or property damage during the policy period," it is the *bodily injury* that must occur during the Policy period, not the insured's act.[20]  Here, the bodily injuries suffered by the Claimants did not become known until the late 1990s, and all the Claimants with whom the State has settled had an asbestos-related injury that was diagnosed between the late 1990s and the present. Given the ongoing progressive nature of asbestos injury, we agree with the State regarding the eligibility of Claimants exposed

---

[20] Consistent with the definition of occurrence, the Policy defined "bodily injury" as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death . . . ."

61

only prior to the Policy period. A Claimant exposed either during or prior to the Policy period may, despite a lack of manifestation of injury during the Policy period, be covered under the Policy "as long as it can be determined, even retroactively, that some injury did occur during the policy period" as a result of the State's failure to warn. *Swank*, ¶ 20. The District Court thus erred by holding that Claimants who were exposed only before the Policy period could not qualify for coverage.

¶86 The parties disagree over whether a remand is necessary on this issue, and the State requests that this Court enter a "supplemental judgment" in the amount of $5.9 million for Claimants exposed only prior to the Policy period. However, given the lack of a factual finding on the question, the complexities regarding the number of Claimants, and our statement of the applicable rule, we conclude that remand is necessary for further proceedings to implement this holding.

¶87 *3. Did the District Court err by awarding pre-judgment interest on the settlement amounts and defense costs?*

¶88 Pursuant to its determination that National breached the duty to defend, the District Court awarded pre-judgment interest on the settlement amounts and defense costs assessed against National in consequence of the breaches, reasoning these were "sum certain" amounts. Further, regarding the indemnity payments it determined to be owed for fully defended claims, the District Court awarded pre-judgment interest on the payments, essentially as a consequence of National's breach of the duty to indemnify the State for these claims, in addition to attorney fees and costs thereon. *See Freyer*, ¶¶ 41-42 (insured entitled to consequential damages for insurer's breach of the duty to indemnify in addition

62

to coverage payments up to the policy limits). The District Court imposed pre-judgment interest on all settlements for which National was responsible, whether by reason of breach of the duty to defend or under indemnity coverage, to accrue "from the date they were approved by the respective District Court."

¶89 Noting that interest comprises $31 million of the judgment entered by the District Court, National argues pre-judgment interest is unavailable because the settlement amounts and defense costs were not "clearly ascertainable" before August 16, 2019, the date the District Court entered the Judgment, citing *DiMarzio v. Crazy Mt. Constr., Inc.*, 2010 MT 231, ¶ 59, 358 Mont. 119, 243 P.3d 718. National reasons that until the District Court entered the Judgment, it was not certain these amounts would be assessed against National in this proceeding, as evidenced by the District Court's denial of coverage for some claims. Additionally, National argues the District Court utilized an incorrect 10% interest rate, noting that the rate was changed by legislation in 2017 and would be calculated under the new statute to be 8.5%. The State answers that pre-judgment interest was appropriate because upon court approval of the settlements, the State owed them and the amounts were known on that day. Regarding defense costs, the sums were certain the date the State paid them.

¶90 If recovery of damages is "certain or capable of being made certain by calculation" and "the right to recover [] is vested in the person upon a particular day," the party is entitled to recover interest on the damages from that day. Section 27-1-211, MCA. Pre-judgment interest was denied in *DiMarzio*, but there the amount of damages was not

63

known until the jury verdict was returned. *DiMarzio*, ¶ 60. Here, while National contested liability for the settlements and defense costs, these amounts were known from the time of their court approval and payment. National did not challenge the reasonableness of the settlements in those proceedings. Thus, the legal determination by the District Court in this proceeding made these amounts an obligation of National's without the necessity of a trial for determination of damages, and pre-judgment interest was appropriately assessed for these certain amounts.[21]

¶91 National argues the State resisted National's efforts to pay the State's defense costs during the course of the Libby Claims Litigation, even refusing to provide invoices to National until the District Court ordered the State to do so some 13 years after the Libby Claims Litigation started, and then returning National's $6.9 million check to cover the bill. National argues it "should not be required to pay a windfall sum for prejudgment interest on defense costs it made every effort to pay." National's point is not without merit. However, viewed within the larger context of the entire case, the State's refusal to accept National's proffered indemnity positions has been justified in this proceeding, and the State had to avoid waiver of its position. Further, National's years-long delay in seeking resolution of those disputed issues has been declared a breach of the duty to defend. Given these circumstances, the State's uncooperative actions do not disqualify it for an award of

---

[21] The District Court agreed with National's argument opposing assessment of pre-judgment interest on the attorney fees and costs for defense of this action, and the State does not cross-appeal the denial of that interest assessment.

64

pre-judgment interest. *See Freyer*, ¶ 41 (insured did not breach its duty to cooperate in light of insurer's breach of the duty to indemnify).

¶92 The Montana Legislature amended § 25-9-205, MCA, in 2017, providing that interest on judgments would be assessed at the rate for "bank prime loans published by the federal reserve system" on the day judgment is entered, plus 3%. 2017 Mt. Ch. 446; § 25-9-205(1)(a), MCA. However, the legislation was made inapplicable to proceedings that began prior to July 1, 2017. 2017 Mt. Ch. 446, §§ 3, 5. This action was initiated before the effective date of the legislation and, thus, all prejudgment interest National was ordered to pay was calculated at the correct rate.

¶93 *4. Did the District Court's rulings violate National's due process and contract clause rights under the Montana and United States Constitutions?*

¶94 Lastly, National briefly offers several overlapping constitutional arguments. Echoing its estoppel argument, National contends the District Court's remedy for the breaches of the duty to defend "retroactively revises the Policy's terms to create coverage where none existed, in violation of due process and the prohibition against impairment of contractual rights." National also argues that the Judgment "magnifies 32-fold National's $3 million Policy limit," which constitutes "disproportionate punishment . . . through imposition of grossly excessive damages," in violation of due process.

¶95 First, the remedy for an insurer's breach of the duty to defend is long-established in Montana, having been a part of the law, both statutory and common law, for over 100 years. *See Staples*, ¶ 27 (citing *Independent Milk & Cream Co. v. Aetna Life Ins. Co.*, 68 Mont. 152, 158, 216 P. 1109, 1111 (1923); § 28-11-316, MCA, first enacted in 1895). We

65

explained in 2004, the year before National first breached the duty to defend, that Montana law was "well-settled" and "clearly provides that where the insurer refuses to defend a claim and does so unjustifiably, that insurer becomes liable for defense costs and judgments." *Staples*, ¶¶ 20, 27 (internal quotation omitted). Estoppel is not a retroactive revision of policy terms, but a remedy for contractual, statutory and common law breaches that recognizes the difficult position in which an insurer's breach of the duty to defend places the insured. While corporations are "persons within the meaning of the equal protection and due process of law clauses," *Grosjean v. American Press Co.*, 297 U.S. 233, 244, 56 S. Ct. 444, 447 (1936) (internal quotation marks omitted), and "[t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor," *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (citations omitted), National is not a tortfeasor being "punished" for its actions. Rather, it is being held to account for breaches of its contractual and legal duty to defend, as the law requires of and imposes upon all insurers, and for payment under the coverages provided by a nearly 50-year-old Policy.

¶96 Further, National agreed to insure the Montana government at a time in which the dangerous health conditions of the Libby Mine, about which the State inspected but failed to warn, was injuring numerous people. The State paid for the insurance to receive the benefit of the bargain. To be sure, the risk presented by the State's broad duties and obligations was significant, and even led to its inability to contract for general liability insurance in the years after National terminated the Policy, requiring the State to

66

self-insure. However, it so happened that this significant risk ripened, many years later, into State liability for bodily injury that undoubtedly occurred during the Policy period, on National's watch.

¶97 Regarding impairment of contracts, the Montana Legislature is prohibited from passing laws "impairing the obligation of contracts." U.S. Const., art. 1, § 10; Mont. Const., art. II, § 31. However, almost a century ago, the Supreme Court of the United States noted that "[i]t has been settled by a long line of decisions" that the contracts clause is not applicable to judicial decisions. *Tidal Oil Co. v. Flanagan*, 263 U.S. 444, 451 (1924); *see also Seven Up Pete Venture v. Mont.*, 2005 MT 146, ¶¶ 40-42, 327 Mont. 306, 114 P.3d 1009 (restriction upon impairment of contracts applies to state laws). Here, the District Court is not the Montana Legislature, nor has it enacted or modified laws in passing its judgment upon National that come within this constitutional prohibition.

¶98 Procedural due process "requires notice and the opportunity to be heard at a meaningful time and in a meaningful manner." *Steab v. Luna*, 2010 MT 125, ¶ 22, 356 Mont. 372, 233 P.3d 351 (citations omitted). The District Court thoroughly entertained National's coverage arguments and provided ample opportunity to contest the State's presentation of qualifying claims and proper calculation thereof, including the sufficiency of evidentiary support for the Claims and the filing of multiple objections to the amounts proposed for the Judgment. National chose not to challenge the reasonableness of settlements in the underlying actions, and thus its ability to contest those amounts in this action was limited, including the "contingency" amounts that were a part of those

67

court-approved settlements. *See Abbey/Land LLC v. Interstate Mechanical, Inc.*, 2015 MT 77, ¶ 15, 378 Mont. 372, 345 P.3d 1032 (an insurer should raise reasonableness issues in the underlying lawsuit, and not in a separate declaratory judgment action concerning coverage). Another opportunity will be presented on the issues herein remanded for further factfinding. We conclude National's procedural due process rights were not violated.

¶99 Finally, National asserts it has been singled out for "arbitrary and capricious" treatment and received rulings from the District Court which, it contends, "erroneously construed the Policy in favor of the State's interests in this jurisdiction even though it would not be so interpreted elsewhere," in violation of substantive due process. We decline to speculate about what National is implying with regard to "favor[ing] the State's interests in this jurisdiction," but, regardless, it is also our judgment that National has received the best effort of the Montana judiciary to fully adjudicate all issues raised in this difficult litigation dispassionately, without bias, and with impartiality to all parties.

## CONCLUSION

¶100 We affirm the District Court's rulings on National's breach of the duty to defend and the consequences thereof, including assessment of prejudgment interest. We affirm the District Court's indemnity determinations, including assessment of attorney fees, costs, and prejudgment interest, with the exception of the two issues discussed herein: 1) the number of occurrences under the Policy, and the resulting calculation of Policy limits; and 2) the eligibility of Claimants exposed to asbestos only prior to the Policy period. We

remand for further proceedings before the District Court as are necessary to resolve those two issues, and for entry of an amended judgment.

/S/ JIM RICE

We concur:

/S/ MIKE McGRATH
/S/ DIRK M. SANDEFUR
/S/ INGRID GUSTAFSON
/S/ JAMES JEREMIAH SHEA
/S/ COLETTE B. DAVIES
District Court Judge Colette B. Davies
Sitting for Justice Beth Baker

District Court Judge Colette B. Davies, concurring.

¶101 This Court's majority has allowed the potential recoupment of defense costs based on the unique facts of this case, which involves sophisticated parties and the application of insurance policies over multiple policy periods. I concur in the result as applied to this case. However, I write separately to concur to emphasize that the parties did not raise—and this Court has not addressed—whether an insurer has the right to recoupment against the average insured in the absence of a policy provision allowing recoupment.

¶102 Both parties' arguments assume Montana law permits an insurer to recoup not only indemnity payments but also defense costs paid in an underlying liability matter, under certain circumstances, when a finding of no-coverage is later made in a separate declaratory judgment action. The foundation for this assumption is murky, and the troubling policy

69

precedent of such a finding is easily blurred in this particular matter, given the sophistication of the stakeholders.[1]

¶103 For the average policy holder, the threat of recoupment transfers the risk of failing to defend from the insurer squarely to the insured. An insured, not knowing if he has coverage in effect, must pay to defend himself in the declaratory judgment action, as well as risk repayment of policy proceeds and the costs associated with his defense in the underlying action if he does not prevail in the declaratory judgment action. Under this scenario, the insured would have been better off with no defense from the insurer at all, rather than a defense with the risk of recoupment.

¶104 An insurer has a duty to defend "when a complaint against an insured alleges facts that if proven would result in coverage." *State Farm Mut. Auto. Ins. Co. v. Freyer*, 2013 MT 301, ¶ 26, 372 Mont. 191, 312 P.3d 403 (citing *State Farm Fire and Cas. Co. v. Schwan*, 2013 MT 216, ¶ 15, 371 Mont. 192, 308 P.3d 48 (internal quotations and emphasis omitted). "Unless there exists an unequivocal demonstration that the claim against an insured does not fall within the insurance policy's coverage, an insurer has a duty to defend." *Farmers Union Mut. Ins. Co. v. Staples*, 2004 MT 108, ¶ 22, 321 Mont. 99, 90 P.3d 381 (citation omitted). "[T]he duty to defend is absolute while the duty to settle is generally more discretionary." *Draggin' Y Cattle Co., Inc. v. Junkermier, Clark, Campanella, Stevens, P.C.*, 2019 MT 97, ¶ 30, 395 Mont. 316, 439 P.3d 935 (internal

[1] The Insurance Code recognizes a distinction between sophisticated and average insureds. For example, the Insurance Policy Language Simplification Act, §§ 33-15-333, -340, MCA, does not apply to "large commercial risks whose aggregate annual premiums for insurance on all risks totals at least $100,000." Section 33-15-336(2)(e), MCA.

citations and quotation omitted). An insurer that provides a conditional defense by reserving the right to recoup defense costs is not providing an absolute defense, and is not giving the necessary substance to the duty to defend.

¶105 In Montana, the notion of an insurer's right to recoup defense costs for claims subsequently determined to be uncovered arises largely from two Montana Supreme Court decisions. *See Travelers Cas. & Sur. Co. v. Ribi Immunochem Research*, 2005 MT 50, 326 Mont. 174, 108 P.3d 469; *Horace Mann Ins. Co. v. Hanke*, 2013 MT 320, 372 Mont. 350, 312 P.3d 429. Although both *Ribi Immunochem* and *Hanke* discuss recoupment, their holdings are not as sweeping and clear as often portrayed. Both have unique, factual circumstances that limit their applicability.

¶106 In *Ribi Immunochem*, a sophisticated biopharmaceutical product company (Ribi) used toxic solvents to extract and purify its products, and its employees then transported the resulting waste and poured these liquid contaminants into an open earthen pit. *Ribi Immunochem*, ¶ 8. Ribi was sued by neighboring landowners, the State of Montana, and the United States. *Ribi Immunochem*, ¶ 9. Ribi tendered the suits to its CGL carrier, Travelers; Travelers defended Ribi under a reservation of rights and notified Ribi it intended to seek reimbursement for defense costs. Critically, "Travelers and Ribi eventually *agreed* that Travelers would pay fifty percent of Ribi's defense costs in its suit with the neighboring property owners." *Ribi Immunochem*, ¶ 10 (emphasis added). Travelers then notified Ribi it would defend the suits brought by the governments, but again stated its position that there was no coverage, that it owed no duty to Ribi, and that

71

it would seek reimbursement of defense costs. Ribi "raised no objections," and Travelers defended these suits under the reservation of rights. *Ribi Immunochem*, ¶ 11 (emphasis added).

¶107 In the subsequent declaratory judgment action, this Court agreed with the district court's determination that the claims against Ribi were not covered by Travelers' policy. *Ribi Immunochem*, ¶ 37. While the question of recoupment was not the primary focus of the decision, it was briefly addressed. This Court looked to a two-part analysis applied in *United Nat. Ins. Co. v. SST Fitness Corp.*, 309 F.3d 914, 919 (6th Cir. 2002). This test considers whether the carrier (1) timely and explicitly reserved the right to recoup defense costs, and (2) provided specific, adequate notice to the insured of the possibility of recoupment. *Ribi Immunochem,* ¶ 49. Applying that test, this Court held Travelers could recoup its defense costs associated with the uncovered pollution claims because it met both prongs of this analysis. Travelers had timely and explicitly reserved its right to recoup defense costs and gave Ribi specific, adequate notice of its intention to do so. *Ribi Immunochem*, ¶ 50.

¶108 Notably, this Court did not incorporate in its analysis the unique fact that Travelers and Ribi had actually *agreed* to recoupment as to the neighbors' lawsuit, and that Ribi had not objected to recoupment in the governments' cases. *Ribi Immunochem*, ¶¶ 10-11. Further, the opinion is silent as to whether or not the insurance contract itself provided for recoupment of defense costs.

72

¶109 Eight years after *Ribi Immunochem*, this Court decided the even trickier case of *Hanke*. In oft-cited authority, this Court held:

> The insurer . . . may file a declaratory judgment action to resolve coverage issues. *Staples*, ¶ 28. The insurer may seek to recover the expenses that the insurer incurred in defending a claim outside of the insured's policy coverage in the declaratory judgment action. *Staples*, ¶ 28. An insurer's failure to follow this course leaves the insurer potentially liable for defense costs and judgments. *Staples*, ¶ 27; § 28-11-316, MCA.

*Hanke*, ¶ 25.

¶110 The confusion arises because *Hanke* involved recoupment of an *indemnity* payment for an uncovered claim, not for *defense costs.* The opinion regrettably lumps the two critically distinct types of payments together.

¶111 In *Hanke*, the insured was sued for intentionally damaging the property of another. *Hanke*, ¶ 9. The insured tendered the suit to his carrier, and the carrier disputed coverage based upon the intentional nature of the allegations. However, the carrier assumed the defense under a reservation of rights and filed a declaratory judgment action on the coverage dispute. *Hanke*, ¶¶ 6, 8.

¶112 A settlement was reached on the underlying matter before resolution of the declaratory judgment action on coverage, with the parties agreeing to pay the plaintiff property owner $54,000. The carrier agreed to contribute $20,000, and the insured agreed to personally pay the other $34,000 of the settlement amount. *Hanke*, ¶ 7. Unfortunately, the insured failed to pay his portion of the settlement as agreed and the carrier stepped in and paid the $34,000 owed by the insured, subsequently seeking reimbursement of this indemnity payment from the insured in the declaratory action. *Hanke*, ¶¶ 7, 10. Upon a

73

finding of no coverage for the claimed property damage, the district court awarded the carrier reimbursement of the $34,000. *Hanke*, ¶¶ 9, 11.

¶113 This Court affirmed the $34,000 award to reimburse the settlement payment advanced. *Hanke*, ¶ 21. Notably, the $34,000 was reimbursement for an indemnity payment, not defense costs associated with defending the underlying matter. First, this Court noted that the carrier had reserved its right to recoup "'defense and settlement costs'" based upon "'rights as allowed under the policy contract.'" *Hanke*, ¶ 29. This language suggests that the policy at issue had a contractual right of recovery for defense costs. But more importantly, this Court held:

> The correspondence between Horace Mann and the Hankes and their counsel establishes that Horace Mann reserved its right to recover the additional $34,000 that it paid to the settlement with Warner . . . . Horace Mann adhered to the procedure that this Court has established to contest the boundaries of coverage and to recoup expenses. *Ribi Immunochem*, ¶¶ 48-50. We affirm the District Court's award of $34,000 [*the indemnity payment to cover what the insured owed the plaintiff, not the defense costs associated with the defense of the lawsuit against the insured*] to reimburse Horace Mann for its advancement of the Hankes' share of the settlement.

*Hanke*, ¶ 31.

¶114 While dicta in *Hanke* appears to allow recoupment of defense costs, the Court actually only affirmed recoupment of an indemnity payment which the insured had agreed to make, but then reneged. *Hanke*, ¶ 31. Further, in reaching its decision, this Court relied upon *Staples* to support the recovery of defense costs, but *Staples* involved a situation where the insurer wrongly failed to defend the insured. *Staples*, ¶ 26. It addressed the

need to file a declaratory judgment action to determine coverage; it did not address defense costs at all. In fact, the Court noted:

> If FUMIC wished to dispute coverage, it could have defended Staples under a reservation of rights and later sought judicial determination through a declaratory judgment action to determine whether coverage existed . . . . However, because FUMIC unjustifiably refused to defend, it is estopped from denying coverage.

*Staples*, ¶ 28 (internal citations omitted).

¶115 Thus, the law relied upon to support recoupment of defense costs is not as solid as presumed by the parties here. In this case, the Court is confronted with a request for recoupment based not on a contract provision, but on the shaky foundation of *Ribi Immunochem* and *Hanke*. However, the parties here engaged in lengthy negotiations regarding defense and recoupment, with both sides represented by counsel.

¶116 Rather than tacitly accepting those cases as supporting recoupment generally, I would analyze the recoupment claim under the longstanding precedent of this Court. The insurer must defend unless and until it has unequivocally demonstrated that the claim does not fall within the coverage. *Staples*, ¶ 22. As this Court has held, "there must exist an unequivocal demonstration that the claim against the insured does not fall within the policy coverage *before* an insurer can refuse to defend; otherwise the insurer has a duty to defend." *Newman v. Scottsdale Ins. Co.*, 2013 MT 125, ¶ 57, 370 Mont. 133, 301 P.3d 348 (citing *Staples*, ¶ 24). (Emphasis added.) Allowing an insurer to recoup defense costs incurred prior to resolution of the declaratory action relieves the insurer of the obligation to defend until an unequivocal demonstration has been established. Absent a contractual right to

recoup, the insurer may not recover defense costs which were incurred prior to the unequivocal demonstration, and then only if the insurer has timely and explicitly reserved the right and provided adequate notice to the insured. *Ribi Immunochem*, ¶ 49.

¶117 Any analysis of recoupment of defense costs which does not address whether the insurer has made the required unequivocal demonstration prior to incurring the defense costs impermissibly shifts the burden to the insured. The insured may be forced to pay for the defense of both the underlying matter and the declaratory judgment action simply because the carrier could not unequivocally show that an exclusion applies. An insurer's duty to defend is triggered by the allegations of the complaint. If an insurer reserves the right to recoup defense costs and expenses based upon a later finding of non-coverage, the insurer is unilaterally changing the standard from whether the allegations trigger coverage to one of whether coverage exists. This Court has expressly refused to "impose a requirement that a district court must analyze policy coverage before finding breach of a duty to defend." *Tidyman's Mgmt. Servs. Inc. v. Davis*, 2014 MT 205, ¶ 26, 376 Mont. 80, 330 P.3d 1139.

¶118 Claiming the right to recoupment, particularly if it is not an express contractual term of the policy (which it is not in the case at hand), deprives the insured of the fundamental protective purpose of the defense guaranteed by the insurance contract. Based on the protective nature of insurance, which is supposed to transfer risk from the insured to the insurer and not the other way around, I would find that a defense conditioned upon

recoupment of defense costs is not consistent with an insurer's duty to defend, absent extraordinary circumstances such as those present in the case before this Court.

/S/ COLETTE B. DAVIES
District Court Judge Colette B. Davies
Sitting for Justice Beth Baker

Justice Ingrid Gustafson joins in the concurring Opinion of Judge Colette B. Davies.

/S/ INGRID GUSTAFSON

Justice Laurie McKinnon, dissenting.

¶119 I would conclude that National did not breach its duty to defend the State—a self-insurer represented by counsel since July 1976. Accordingly, National is not estopped from raising coverage under the Policy. Further, this Court's decision in *Orr* definitively established the following: the State knew of the significant and expected injury to mine workers from asbestos dust since 1956; the State had a duty to disclose "to the public and to persons whose employment subjected them to [these] health hazards"; and the workers had a cause of action against the State for breach of its duty to disclose, correct, or prevent workplace conditions known to be hazardous to the miners' health. *Orr*, ¶ 39. In *Orr*, the Court held that "[p]lainly, the State knew as a result of its inspections" the asbestos dust posed significant health risks to workers and that the dangers to the workers in the Libby Mine were already "foreseeable" and "clear and present" by "as early as 1956." *Orr*, ¶ 37. Under the clear and unambiguous terms of the Policy, known losses and intentional acts are excluded from coverage. Today's decision is irreconcilable with *Orr*;

77

with this Court's precedent respecting the duty to defend; and with basic contract principles for interpreting the Policy, as it erroneously creates coverage through estoppel. Although National had only a two-year policy with the State, the Court concludes it is responsible for decades of claims spanning nearly 50 years, during a time when the State chose to self-insure and the mining claims were being actively litigated by counsel. Moreover, even if the State had coverage for the two-year period, National should only be required to pay its proportional share of defense and indemnity costs for the time when the Policy was in effect. I dissent.

¶120 In contrast to the duty to indemnify—which arises only if the facts actually established in the underlying suit amount to a covered claim—the duty to defend arises if a plaintiff's factual allegations, read together with the policy at issue, potentially support a claim. The allegations made and the language of the insurance policy determine an insurer's duty to defend. The duty to defend is not affected by facts ascertained before the suit, developed during litigation, or by the ultimate outcome of the litigation. Further, standard policy language—including National's here—dictates that, even if the allegations are false, fraudulent, or groundless, the insurer is nevertheless obligated to defend. *See, e.g.*, *McAlear v. St. Paul Ins. Cos*, 158 Mont. 452, 453, 493 P.2d 331, 332 (1972) (discussing a liability policy issued around the same time period as National's which also contained this language).

¶121 An insurer should provide the insured a defense under a reservation of rights if the insurer believes that a question exists about the boundaries of coverage. *Hanke*, ¶ 25. The

insurer may then file a declaratory judgment action to resolve coverage issues. *Staples*, ¶ 28. The insurer may seek to recover the expenses that the insurer incurred in defending a claim outside of the insured's policy coverage in the declaratory judgment action. *Hanke*, ¶ 25 (citing *Staples*, ¶ 28). An insurer's failure to follow this course leaves the insurer potentially liable for defense costs and judgments. *Staples*, ¶ 27; § 28-11-316, MCA. The purpose of an insurer's reservation of rights is not to impose conditions, but rather, "to assert any possible defense to coverage to avoid waiving the right to raise them in the future." *Walden v. Maryland Cas. Co.*, 2015 WL 10985375, at *5 (D. Mont. Jan. 26, 2015). A reservation is a statement of non-waiver. Accordingly, letters of reservation do not constitute a breach of contract or in any way suggest an insurer has breached a duty to defend; policyholders do not risk losing any rights that they would have otherwise had under the terms of the policy.

¶122 This Court has expressly recognized the right of an insured to recover defense costs where the right has been specifically reserved and the insured has had adequate notice of the potential reimbursement. *Ribi*, ¶¶ 48-49. Here, National could only be liable for the period during which it was on the risk. National's liability is therefore limited to the defense of suits for harm and the indemnification of sums that the State becomes obligated to pay for bodily injuries that occurred "during the policy period." An insurer does not contract to pay defense costs for occurrences which took place outside the policy period.[1]

---

[1] It is unnecessary for me to address what claims qualify as coming within the policy period of 1973 through 1975 because I would conclude there is no coverage under the Policy. However, the Court offers an analysis inconsistent with *Orr* when it holds that:

Accordingly, the plain language of the Policy provides for a discreet and finite period, and National assumed risks only for losses during the Policy period. I turn now to whether National breached its duty to provide a defense to the State under the terms of the Policy.

¶123 First, I agree with the Court that, respecting the timeframe between 2002 and July 2005, National did not breach its duty to defend. Opinion, ¶¶ 24-30.

¶124 Moving to the second time frame identified by the Court, ranging from National's July 18, 2005 letter to its May 10, 2006 letter, I disagree with the Court's interpretation that National's July 18, 2005 letter to the State did not constitute an offer to provide a defense; instead, I would conclude that National was accurately and specifically setting forth a reservation of rights to allocate among all insurers the cost of defending the State against the Libby Mine Claims. As a self-insurer, the State must contribute to the payment of the Libby Mine Claims on a pro rata basis. *See, e.g.*, 15 Steven Plitt et. al, *Couch on Insurance* § 220:31, 220-36 (3d ed. 2015) (majority rule is that a self-insured entity

---

[G]iven the ongoing progressive nature of asbestos injury . . . [a] Claimant exposed either during or prior to the Policy period may, despite lack of manifestation of injury during the Policy period, be covered under the Policy 'as long as it can be determined, even retroactively, that some injury did occur during the policy period' as a result of the State's failure to warn.

Opinion, ¶ 85. This follows the Court's recognition that "bodily injuries suffered by the Claimants did not become known until the late 1990s, and all the Claimants with whom the State has settled had an asbestos-related injury that was diagnosed between the late 1990s and the present." Opinion, ¶ 85. Again, the outcome of these proceedings is determined by our decision in *Orr*. In *Orr*, this Court concluded that the State was not entitled to sovereign immunity because the tort of negligence requires four elements—duty, breach of duty, causation, and damages—and because the workers' claims in *Orr* did not accrue until "their 'damages' became manifest in 1998, when they were medically diagnosed with asbestos-related illnesses." *Orr*, ¶ 56. We explained that "[i]n Montana, no cause of action, or suit, for negligence accrues until all elements of the claim exist" and that "[t]he causes of action of the surviving Miners did not accrue until damage could be proven. [ ] [N]o damage could be proven until their injuries were manifest." *Orr*, ¶¶ 74, 76.

80

"must bear its pro rata share"). For decades, the State was its own insurer and insured claims for injuries spanning nearly 50 years. National sought to protect its lawful interest by paying only the defense costs representing its proportional and equitable allocation of the time "at risk."

¶125 I do not accept the Court's conclusion that this was an unlawful pro rata condition, because pro rata conditions are not unlawful and the plain language of the Policy provided that National was at risk only "during the policy period." Rather, in my opinion, this was a lawful reservation of rights and a confirmation that National would provide a defense so that the State would not be "improperly abandon[ed]," left without a defense, or "justified in taking steps to limit [the State's] personal liability" by entering a stipulated judgment. *Freyer*, ¶34 (citations omitted). The underlying justification for imposing a duty to defend is to avoid the insured being improperly abandoned and left without a defense. These concerns, however, are absent here, where the State was self-insured, represented by counsel, and National offered a defense. Moreover, to the extent there was any confusion that National would provide a defense, National's May 10, 2006 letter provides unequivocal assurance that National will defend against the Libby Mine Claims. Within the context of the State's status as a self-insurer, and given that the State was represented by counsel actively engaged in defending against the Libby Mine Claims, I cannot agree that National breached its duty to defend the State and is thereby estopped from raising coverage defenses for a two-year policy respecting claims covering a nearly 50-year period.

81

¶126 The Court concludes, respecting the period between National's May 10, 2006 letter and National's filing of the declaratory judgment action on February 23, 2012, that National breached its duty to defend because it should have filed its declaratory judgment action sometime earlier. The Court reaches this holding despite also concluding that National provided a defense to the State. Here, the Court has completely altered the scope and rules of an insurer's requirement to provide a defense and interjected itself into the strategic decision-making process of counsel concerning when and whether to initiate a declaratory judgment action. More particularly, the Court's holding is blatantly inconsistent with our recent decision in *Draggin' Y Cattle Co.*, ¶ 38, where we stated:

> We decline to impose as a matter of law a new obligation on a defending insurer as suggested by Appellees, to file a declaratory judgment action before the resolution of the liability case, when the Legislature has provided an express cause of action and remedies for violations of duties expressed in the [Unfair Trades Practices Act].

In my opinion, the Court has inappropriately interfered with the strategic decisions of counsel, who are best able to assess the timing and propriety of filing a declaratory action. We have not previously imposed a requirement that a declaratory judgment action be filed to determine coverage, particularly when the insurer is providing a defense, and have left those decisions to the insurer to be made at its own peril. The Court's new requirement will cause the insurer to incur needless additional litigation costs, require insurers to file premature actions, and risk compromising the underlying litigation so that an insurer is not found in breach of the duty to defend—with the consequent calamitous result of being

estopped from raising coverage and suffering a stipulated judgment far beyond policy limits.

¶127 Here, as a point in fact, the parties engaged in extensive settlement efforts over several years and entered into a Tolling Agreement before National filed its declaratory judgment action. The Tolling Agreement recognized that it was not in the interest of either party to seek an immediate judicial resolution of coverage disputes. That agreement provided: "The Parties agree it is mutually beneficial to enter into this Agreement to preserve the status-quo and therefore agree to toll any statutes of limitation that may be applicable to whatever claims they may have against each other relating to the Policy and applicable law . . . ." In short, we have never required an insurer to file a declaratory judgment action; rather, we have expressly stated that we would not impose such a requirement. *See Draggin' Y*, ¶ 38. Our precedent has always recognized an insurer's choice, when defending under a reservation of rights, to contest coverage by filing a declaratory judgment action. To *require* a party to initiate a court action to avoid breaching a duty to defend, *when they are defending,* is unsupportable.

¶128 Because National did not breach its duty to defend, I would conclude it is not estopped from raising issues of coverage. There are two bases upon which I would conclude the Libby Mine Claims are not covered under the Policy: (1) the State's intentional act of failing to disclose the *known* health hazards to the mine workers, which led to an *expected* injury, does not constitute an "occurrence"; and (2) the State was aware at the Policy's inception that a *known* loss would likely ensue. First, the Policy provides

coverage for an "occurrence" when "an event, or a continuous or repeated exposure to conditions" results in bodily injury during the Policy period "that is neither knowingly nor intentionally caused by or at the direction of the insured." The Policy's plain language provides there is no coverage where the injury was expected by the insured. *See Phalen*, 182 Mont. at 457-59, 597 P. 2d at 725-26; *Ribi*, ¶¶ 18, 20. There can be no question from *Orr* that this Court found a duty was owed by the State to the workers to disclose to them the health hazards posed by their employment. The duty imposed upon the State was to "correct or prevent workplace conditions known to be hazardous to health." *Orr*, ¶ 38. Moreover, the Court in *Orr*, ¶ 37, quoting the findings of the district court, held:

> It could be fairly said that since 1956, the state of Montana was on notice that the asbestos dust at the Libby mine was dangerous and that the mine owner was not making improvements as recommended by the State. Also, it appears the record is bereft of any actions taken by the State to warn the miners or the Libby townspeople of their plight.

¶129 Between 1956 and early 1964, the State inspected the plant numerous times, received the death notices of three mine employees from asbestos-related diseases, and identified a deteriorating and increasingly dangerous workplace. "Surely, the State would have noted in its 1958 and 1963 reports if Zonolite or Grace had posted warning signs to employees, provided safety equipment, arranged for medical monitoring, or established safety procedures to protect the employees from ever-increasing concentrations of asbestos in airborne dust." *Orr*, ¶ 38. The State, although clearly aware of the dangerous conditions after each inspection and knowing the likely fatal outcome from asbestos exposure, never informed the workers of the dangers. I cannot accept the Court's rationale, post-*Orr*, that

84

the State made at least a partial effort to warn the miners when it notified the union. *Orr* imposed a duty on the State that "ran to the public and to persons whose employment subjected them to health hazards." *Orr*, ¶ 39. Here, the Court, in the interests of consistency and fairness, should not change the rules established in *Orr* by reconsidering whether the State's failure to disclose to workers the hazards of their workplace was knowing and intentional.

¶130 In a divided decision, the *Orr* Court premised the imposition of the State's duty on the State's *knowing* and *intentional* failure to disclose to workers the health hazards of their employment. *Orr* imposed a duty because it held the State's conduct was, in fact, knowing and intentional. The *Orr* dissent argued that "[s]overeign immunity was abrogated only because insurance was available" and that "sovereign immunity arose out of necessity to ensure the political and economic stability of the government by insulating the public treasury from suits for monetary damages." *Orr*, ¶¶ 87, 97 (Warner, J., dissenting). The *Orr* dissent maintained that the State owed no duty to disclose to workers the health hazards of their employment. *See Orr*, ¶ 86 (Warner, J., dissenting). The Court in *Orr*, however, imposed a duty based upon the State's knowing and intentional conduct. We cannot now distort or adapt the law in a manner which protects state coiffures—that approach was rejected in *Orr* when this Court created a cause of action for the miners. Importantly, the *Orr* Court specifically rejected the State's argument that "it could not foresee that the Mine owner would not fulfill its legal obligations as a landowner and employer." *Orr*, ¶ 37. While the Court in *Orr* looked to the State's statutory obligations, it concluded the risk was

"foreseeable" and the harm was "clear and present"—both considerations for the elements of duty, breach, and causation. *Orr*, ¶ 37 ("The question of whether the risks were foreseeable had been answered as early as 1956; the dangers to the workers were already clear and present by that time.") While the *Orr* Court remarked in its conclusion that a trier of fact must find the remaining elements of negligence, this remark merely reiterated basic principles of negligence law, which commit the cause of action to the trier of fact. *Orr*, ¶ 81. The remark was not necessary to the determination of whether a duty was owed by the State to the miners. Placed in context, the remark was made to quell the dissent in *Orr* and was a response to the dissent's claims that the *Orr* Court had just handed claimants a cause of action. The *Orr* Court's analysis and holding, as demonstrated by what has been litigated in these proceedings, effectively only left the element of damages open for determination. *Orr*, ¶ 37. To color *Orr* differently, nearly two decades later, is an unfair distortion of our precedent. The significance of *Orr* to these proceedings is that *Orr* conclusively established that the State knew injuries to the miners would occur from their exposure to asbestos and yet failed to warn the miners of this clear and present danger—a known loss for purposes of the Policy's coverage provisions. The State does not dispute the conclusions of the Court in *Orr*, nor I am willing to rewrite *Orr*. Once the *Orr* Court established the State breached its duty to warn the miners of the hazardous conditions of their workplace, the miners could not make informed decisions about their health and their workplace. Here, the Policy unambiguously excludes knowing and intentional conduct of the insured.

¶131 As a corollary to the Policy's exclusion for an intentional act of the insured, I would also conclude under the "known loss doctrine" that the State was aware at the inception of the Policy that a loss would likely ensue. This Court has held coverage is unavailable where, before the inception of the policy, the insured "was aware of a dangerous condition" that caused the injuries. *Profitt v. J.G. Watts Constr. Co.*, 143 Mont. 210, 216, 387 P.2d 703, 706 (1963). Once again, the *Orr* Court also recognized that the Libby Mine Claims reflect a loss that was known to the State prior to the inception of the Policy:

> Plainly the State knew as a result of its inspections that the Mine's owner was doing nothing to protect the workers from the toxins in their midst. *The question of whether the risks were foreseeable had been answered as early as 1956; the dangers to the workers were already clear and present by that time.*

*Orr,* ¶ 37 (emphasis added).

¶132 Consequently, because the State, at the inception of the Policy, knew of the dangerous conditions of the Libby Mine, National has no obligation to provide coverage as a matter of law. Here, the undisputed facts establish that the State had issued death certificates for three Libby Mine workers between 1961 and 1964, which noted that the workers died from asbestos-related health conditions. During the State's inspections prior to 1974, State inspectors noted the unsanitary and unhealthy conditions of the mine. The State notified the owners and explained the seriousness of asbestosis and its likely fatal outcome. The State noted a direct link between high asbestos levels at the Libby Mine and serious bodily injury. As early as 1956, the State was aware of serious medical conditions,

injuries, and deaths associated with asbestos exposure. These are undisputed facts which this Court concluded in *Orr* required the imposition of a duty. These undisputed facts reflect a loss that was known to the State prior to the inception of the Policy and thus is excluded, as a matter of law, from coverage because the State had "knowledge of potential liability."

¶133 In my opinion, National did not breach its duty to provide the State a defense, and I would not preclude National from disputing coverage. Our decision in *Orr* is controlling and established the State acted intentionally in failing to disclose the hazardous conditions of the mine and knew of the injury and loss that was eminent. I would apply the plain language of the Policy and conclude that National was not obligated to defend and indemnify the State for the Libby Mine Claims.

/S/ LAURIE McKINNON